

Christina Wong
10 North Post Street, Suite 700
Spokane, Washington 99201
509-624-7606
Attorney for Paulino Portillo-Orozco

# United States District Court
## Eastern District of Washington
### Hon. Rosanna Malouf Peterson

| | |
|---|---|
| United States, | No.: 2:20-CR-54-RMP |
| Plaintiff, | Motion to Dismiss Because §1326 Violates the Fifth Amendment |
| v. | |
| Paulino Portillo-Orozco, | May 10, 2022 – 11:00 a.m. No Oral Argument Requested |
| Defendant. | |

## I.    Introduction

Racism motivated the passage of the 1929 law that first criminalized reentry, racism motivated the 1952 recodification of that law at 8 U.S.C. § 1326, and the government continues to rely on this racially-motivated law to prosecute Latinxs.

In 1929, Congress passed the Undesirable Aliens Act, which criminalized after-the-fact border crossings as a compromise between two sides—one side consisted of racists obsessed with keeping "rat men" from poisoning the Anglo-American gene pool; the other side consisted of white business owners seeking cheap labor. So began this country's shameful history of encouraging Latinxs to come and work its fields, only to then prosecute and imprison them for crossing the border.

In 1952, Congress consolidated the country's immigration laws under the Immigration and Naturalization Act (INA). The Deputy Attorney General wrote to Congress asking that it expand the Undesirable Alien Act's provision criminalizing reentry (i.e., returning to the United States following deportation) so that more "wetbacks" could be prosecuted and imprisoned. Congress complied. President Truman vetoed the INA, urging Congress to "shake off this dead weight of past mistakes" and revise our immigration laws to give "a true reflection of the ideals we stand for." Congress overrode the presidential veto, recodifying the Undesirable

Aliens Act's unlawful reentry provision at 8 U.S.C. § 1326. Congress has since amended §1326 five times, always to increase its penalties.[1]

Today, roughly a third of all federal prosecutions involve §1326 violations, and over 99% of those convicted are Hispanic.[2] Because racism motivated Congress to criminalize reentry and because §1326 disparately impacts Latinxs, the law violates the Fifth Amendment's guarantee of equal protection. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977).

Earlier this year, in the District of Nevada, the Honorable Miranda M. Du held an evidentiary hearing on §1326's constitutionality. After reviewing extensive evidence and hearing expert testimony from both Professor Kelly Lytle Hernández[3] and Professor Benjamin Gonzalez O'Brien,[4] Judge Du issued a thorough and well-reasoned order detailing the unlawful reentry statute's sordid history.[5] In that order,

---

[1] *See U.S. v. Carrillo-Lopez*, --- F.Supp.3d ----, 2021 WL 3667330 at *4 (D. Nev. Aug. 18, 2021).
[2] U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.
[3] Professor Lytle Hernández is the Tom Lifka Endowed Chair in History at the University of California at Los Angeles and a 2019 John D. and Catherine T. MacArthur Fellow. *See* Exhibit A (Professor Lytle Hernández CV).
[4] Professor Gonzalez O'Brien is an Associate Professor of Political Science at San Diego State University. *See* Exhibit B (Professor Gonzalez O'Brien CV).
[5] The defense has included as exhibits all evidence that was before Judge Du, including transcripts from the hearings at which Professor Lytle Hernández and Professor Gonzales O'Brien testified. With this evidence before the Court, the defense does not request an evidentiary hearing. However, should the Court elect to hold an evidentiary hearing, the defense would anticipate calling Professor Lytle Hernández and Professor Gonzalez O'Brien to testify.

Judge Du held not only that §1326 disparately impacts Latinxs, but also that Congress was motivated by racial animus when it enacted the original unlawful reentry statute in 1929, as well as when it recodified the statute in 1952. Because the government could offer no evidence that Congress would have enacted the unlawful reentry statute but for its discriminatory purpose, Judge Du ruled that "Section 1326 violates the Equal Protection Clause of the Fifth Amendment" and dismissed the indictment. *See U.S. v. Carrillo-Lopez*, --- F.Supp.3d ----, 2021 WL 3667330 (D. Nev. Aug. 18, 2021).

Paulino Portillo-Orozco stands before the Court accused of violating the very law Judge Du held to be unconstitutional. Mr. Portillo-Orozco came to the United States with his family when he was a teenager and has been a member of our community for over two decades. His alleged crime is returning home to his family (including his four daughters, all U.S. citizens) after being issued a removal.

Because §1326 violates the Fifth Amendment's guarantee of equal protection, Mr. Portillo-Orozco respectfully asks that the Court join Judge Du and dismiss the indictment against him.

## II.   Legal Background

The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the

prohibition against denying to any person the equal protection of the laws." *U.S. v. Windsor*, 570 U.S. 744, 774 (2013).

A facially-neutral law violates the Fifth Amendment's equal protection guarantee if it has a racially disparate impact and the legislature was motivated to enact the statute at least in part by a discriminatory purpose. *See Arlington Heights*, 429 U.S. at 265–68. Disparate impact is established where the law's impact "'bears more heavily on one race than another.'" *Id.* at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Establishing a discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and the Supreme Court has identified the following potential sources of such evidence:

1) the "historical background of the decision;"

2) the "specific sequence of events leading to the challenged decision;"

3) the "legislative or administrative history;" and

4) any "[d]epartures from normal procedural sequence."

*Id.* at 265–68. These are referred to as the *Arlington Heights* factors. While not "purporting to be exhaustive," these factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268.

The threshold for satisfying these factors is low. Because legislatures are rarely "motivated solely by a single concern," a challenger need not show the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Rather, the required showing is limited to "proof that a discriminatory purpose has been a motivating factor in the decision." *Id.* The standard for this showing is a preponderance of the evidence. *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985).

Once a challenger satisfies the *Arlington Heights* test (i.e., demonstrates disparate impact and establishes the law was motivated by a discriminatory purpose), the burden shifts to the government to establish the legislature would have enacted the law "even had the impermissible purpose not been considered." *Id.* at 270 n. 21. If the government cannot carry this burden, the challenged law violates the Fifth Amendment and must be invalidated. *Id.*

## III. Discussion

**A.    Section 1326 disparately impacts Latinxs.**

Section 1326 meets *Arlington Heights'* test because it disparately impacts one race (Latinxs) more than another. *See* 429 U.S. at 266. Ninety-eight percent of those charged with illegal reentry in 2010 were from Latin America,[6] and over 99% of those

---

[6] Mark Motivans, *Immigration Offenders in the Federal Justice System, 2010*, U.S. Dep't of Just.: Bureau of Just. Stat. 22 (2013), available at https://bjs.ojp.gov/content/pub/pdf/iofjs10.pdf. This disparity is not unique to 2010. *See U.S. v. Machic-Xiap*, --- F.Supp.3d ----, 2021 WL

convicted of illegal reentry in 2020 were Hispanic.[7] In prior equal protection

challenges to §1326, the government has not disputed the statute bears more heavily

on Latinxs—and courts have found the statute disparately impacts Latinxs. *See

Carrillo-Lopez* at *6–7; *U.S. v. Machic-Xiap*, --- F.Supp.3d ----, 2021 WL 3362738 at

*10 (D. Or. Aug. 3, 2021).

**B.    The 1929 Congress acted with a discriminatory purpose when it criminalized reentry under the Undesirable Aliens Act.**

Racial animus was—at a minimum—a motivating factor in passing the

Undesirable Aliens Act and its criminalization of reentry. *See Carrillo-Lopez* at *9

("the Act of 1929 was passed during a time when nativism and eugenics were widely

accepted, both in the country at large and by Congress, and … these racist theories

ultimately fueled the Act's passage"); *Machic-Xiap* at *1 ("racism has permeated the

official congressional debate over United States immigration laws since the late 19th

and early 20th centuries, including the 1929 Act").

The evidence of racial animus is so overwhelming that the government has

"conceded that discriminatory intent motivated the passage of the Act of 1929."

---

3362738 at *10 (D. Or. Aug. 3, 2021) (quoting Professor Lytle Hernández's testimony that "Latin-Mexican nationals" comprised between 85 and 99 percent of defendants in unlawful reentry prosecutions under the Undesirable Aliens Act and "the disparate impact upon Mexican and Latinos has not shifted" in the intervening decades, including after Congress enacted §1326).

[7] U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

*Carrillo-Lopez* at *7. Although it's undisputed that discriminatory intent motivated the Undesirable Aliens Act, it's nevertheless instructive to assess the *Arlington Heights* factors because the Act's background informs the recodification of the unlawful reentry portion of that law in 1952 as §1326.

> 1.    **The first factor (the law's historical background) shows a discriminatory purpose because the 1929 Congress relied on racist theories of eugenics.**

Historians refer to the 1920s in the United States as the "Tribal Twenties." Following World War I, there was "a feverish sentiment against presumably disloyal 'hyphenated Americans.'"[8] Nativism and racial animus intensified, and the decade saw the rebirth of the Ku Klux Klan, the coming of age of Jim Crow, and the growing acceptance of eugenics (a faux science attributing biological significance to race).[9] The *Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[10] The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[11]

---

[8] Mae M. Ngai, *Impossible Subjects*, 19–20 (2004 William Chafe, et al.).

[9] Exhibit C (Declaration of Professor Lytle Hernández) at 2.

[10] Jia Lynn Yang, *One Might and Irresistible Tide: The Epic Struggle Over American Immigration*, 8 (2020).

[11] Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America*, 3 (2019).

Fears of "non-white" immigration spurred the introduction of numerous bills,[12] as nativist politicians aimed to "restrict and even end immigration to the United States from every region of the world other than western Europe."[13] Congress began the decade by passing the first numerical restriction on immigration,[14] and for the rest of the decade legislators aimed for "America [to] cease to be the 'melting pot.'"[15] Prominent proponents of immigration restrictions "spoke increasingly of 'racial indigestion'" and "the 'contamination' of Anglo-American society.'"[16] Dr. Harry Laughlin, a leading eugenicist well-known for his model sterilization law (which would later serve as the template for Nazi Germany's sterilization law), testified before Congress many times throughout the decade.[17]  Relying on such racist theories, Congress would anchor its immigration law in eugenics throughout the 1920s.[18]

---

[12] *See generally* Okrent, *supra.*
[13] Exhibit C (Declaration of Professor Lytle Hernández) at 2.
[14] Emergency Immigration Act of 1921, Pub. L. No. 67-5, 42 Stat. 5 (1921).
[15] Yang, *supra*, at 3 (quoting Senator David A. Reed).
[16] Ngai, *supra*, at 23; Kelly Lytle Hernández, *Migra! A History of the U.S. Border Patrol*, 28 (2010).
[17] Ngai, *supra*, at 24; *Harry Laughlin and Eugenics*, Truman State University, available at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/; Exhibit D (*The Eugenical Aspects of Deportation,* Hearings before the Committee on Immigration and Naturalization, House of Representative, 70th Cong., Hearing No. 70.1.4 (1928)) at 2, 3.
[18] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).

Motion to Dismiss

– 8 –

**2.    The second factor (events leading up to the law) shows a discriminatory purpose because reentry's criminalization was a compromise between nativists and industry.**

Over 100 years ago, Congress began focusing legislation around the exclusion of "undesirable" (i.e., non-white) immigrants.[19] The Wartime Measure Act of 1918 first vested authority in the President to restrict entry into the United States "contrary to the public safety."[20] The National Origins Act of 1924 then narrowed the pathways of legal immigration by establishing quotas based on national origin— with 96% of all quota slots reserved for European immigrants.[21]

There was, however, one loophole that infuriated nativists: American industry (primarily agribusinesses in the southwest) successfully lobbied for the National Origins Act to exempt immigrants from the Western hemisphere in order to ensure continued access to cheap Mexican labor.[22] Nativists in Congress grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon,"[23] and proposed numerous bills aimed at ending Mexican immigration.[24] The two major attempts came in 1926 and 1928, but "major employers

---

[19] *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) ("the use of 'code words' may demonstrate discriminatory intent").
[20] Pub. L. No. 65-154, 40 Stat. 599 (1918).
[21] Exhibit C (Declaration of Professor Lytle Hernández) at 3.
[22] Exhibit C (Declaration of Professor Lytle Hernández) at 3; *see* Hans P. Vought, *The Bully Pulpit*, 179 (2004).
[23] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).
[24] Exhibit C (Declaration of Professor Lytle Hernández) at 5.

1  and industries across the west" successfully opposed the bills due to "concern[] that

2  they w[ould] be cut off from access to Mexican workers."[25]

3          In the face of insurmountable industry opposition, nativists in Congress sought

4  a compromise with industry: rather than preventing immigration, they would

5  criminalize it after the fact. This compromise was the brainchild of Secretary of Labor

6  James Davis and Senator Coleman Blease of South Carolina.[26] (Secretary Davis was a

7  believer in eugenics and warned about the "rat type" and "rat men" coming to the

8  United States and jeopardizing the Anglo-American gene pool;[27] Senator Blease was a

9  devout racist and suspected Klan member.[28]) Secretary Davis was torn between his

10 racist desire to protect the American gene pool and his responsibility to maintain a

11 large labor supply for American industry—he reasoned this compromise would allow

12 authorities to expel Mexicans after growing season, thereby avoiding industry

13 resistance.[29] He was onto something, as one influential farmer and lobbyist explained

14 to Congress: "We, in California, would greatly prefer some set up in which our peak

15

16 [25] Exhibit E (Testimony of Professor Lytle Hernández) at 28–30.

17 [26] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*,
ProPublica (June 19, 2020), available at https://www.propublica.org/article/behind-the-
criminal-immigration-law-eugenics-and-white-supremacy.

18 [27] Vought, *supra*, at 174–79.

[28] *See* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*,
19 The Journal of Southern History, 62:1, at 57–86 (Feb. 1996), *available at*
http://www.jstor.com/stable/2211206.

[29] Vought, *supra*, at 216; MacDougall.

labor demands might be met and upon the completion of our harvest these laborers returned to their country."[30]

To bring their plan to fruition, Secretary Davis and Senator Blease collaborated with two powerful members of the House Immigration and Naturalization Committee: Representatives Albert Johnson of Washington and John Box of Texas. Johnson, the Chairman of the Committee, headed the Eugenics Research Association, which supported forced sterilizations.[31] He viewed the "fundamental reason" for immigration restrictions to be "biological," seeking to exclude the "Mexican race."[32] Box viewed the "Mexican peon" as "a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs."[33] He saw Mexicans as "essentially different from us in character, in social position," and viewed the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."[34] Other legislators warned that Mexicans "composed of mixtured blood of White, Indian, and negro" were "pouring into our country, oftentimes at the behest of the

---

[30] Exhibit C (Declaration of Professor Lytle Hernández) at 7.

[31] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, at 242–43 (2002).

[32] Okrent, *supra*, at 3

[33] Exhibit F (Congressional Record, Feb. 9, 1928) at H2817–18.

[34] Exhibit G (Congressional Record, Feb. 16, 1929) at H3619; Exhibit F (Congressional Record, Feb. 9, 1928) at H2817–18.

1  various employers of large industrial enterprises," that "their blood" would be "a

2  very great penalty upon the society which assimilates it," and that "their

3  amalgamation with our people will cause a general weakening, physically and

4  mentally, of our civilization."[35]

5        Chairman Johnson had previously convened hearings on immigration. At one

6  hearing, he admitted into the record a letter from a constituent urging legislators to

7  keep out "the scoff and scum, the mongrel, the bootlegger element from Mexico."[36]

8  At another hearing, the principal witness was Dr. Laughlin (the prominent

9  eugenicist).[37] Chairman Johnson praised Dr. Laughlin's report as a "priceless"

10  resource that would "bear intimately on immigration policy."[38] Dr. Laughlin went on

11  to testify about "protect[ing] American blood from alien contamination," and

12  contended that "[i]mmigration control is the greatest instrument which the Federal

13  Government can use in promoting race conservation of the Nation."[39] He compared

14  the drafters of deportation laws to "successful breeders of thoroughbred horses" and

15  advocated deportation of the "undesirable individual," because otherwise "we

16

17  [35] Exhibit H (Congressional Record, Feb. 3, 1928) at H2462.

18  [36] Exhibit I (*Deportation*, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926)) at 30.

19  [37] Exhibit D (*The Eugenical Aspects of Deportation,* Hearings before the Committee on Immigration and Naturalization, House of Representative, 70th Cong., Hearing No. 70.1.4 (1928)) at 1.
[38] Exhibit D at 3.
[39] Exhibit D at 3, 19.

1 cannot get rid of his blood no matter how inferior it may be, because we cannot deport

2 his offspring born here."[40] Finally, he predicted that so long as the border remained

3 open to immigrants, "there will always be need for deportation, or the 'final

4 selection.'"[41]

5       Chairman Johnson agreed that "[i]mmigration looks more and more like a

6 biological problem, and if the work of this committee results in establishing this

7 principle in our immigration policy we will be well repaid for our efforts."[42] He

8 advocated for Congress's use of the "principle of applied eugenics" to "do

9 everything possible" by "debarring and deporting" more people.[43]

10       In this spirit of "applied eugenics," nativists in Congress set to work

11 criminalizing reentry.

12     **3.**    **The third factor (legislative history) shows a discriminatory**
               **purpose because legislators used racist language.**

13       The compromise between nativists and industry was formalized on January 18,

14 1929, when Senator Blease submitted a report to the full Senate recommending

15 passage of a law that would penalize "aliens who have been expelled from the United

16

17 ───────────────

[40] Exhibit D at 44–45. This was not the only instance of comparing ethnicities to breeds of

18 animals. Representative Patrick O'Sullivan criticized restrictions on Italian immigrants, stating
that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is
to a mongrel." Exhibit J (Congressional Record, Apr. 8, 1924) at H5900.

19 [41] Exhibit D at 44.

[42] Exhibit D at 46.

[43] Exhibit D at 25.

1    States and who reenter the country unlawfully," along with a letter from Secretary

2    Davis advocating passage of the law.[44] The following week, Senator Blease presented

3    the bill on the Senate floor and reported that Chairman Johnson had "asked [him] to

4    get the measures over to the House [within two days]."[45] The Senate passed the

5    bill.[46]

6         Two weeks later, Chairman Johnson submitted a report from the Committee of

7    Immigration and Naturalization to the full House recommending passage of the law.[47]

8    That report noted that "the hearings in the Sixty-ninth Congress on the subject

9    matter contained in the bill were exhaustive," and "[m]uch important testimony was

10   developed."[48] During the debate in the House, representatives made racist remarks,

11   including that Mexicans were a "very undesirable" class that was "poisoning the

12   American citizen."[49] The bill passed the House, and the president signed it into law

13   three days later.[50]

14

15

16

17   [44] Exhibit K (S. Rep. No. 1456, Jan. 17, 1929) at 1–2.
     [45] Exhibit L (Congressional Record, Jan. 23, 1929) at S2092.
18   [46] Exhibit L at S2092.
     [47] Exhibit M (H. Rep. No. 2397, Feb. 6, 1929).
19   [48] Exhibit M (S. Rep. No. 2397 (1929)) at 2.
     [49] Exhibit G (Congressional Record, Feb. 16, 1929) at H3620.
     [50] Exhibit N (Pub. L. No. 1018, Mar. 4, 1929).

Motion to Dismiss

– 14 –

### 4. The fourth factor (deviations from procedural norms) shows a discriminatory purpose because Congress relied on eugenics and racial vitriol.

Examining whether the legislature departed from "normal procedures or substantive conclusions" requires courts to consider any "procedural irregularities" leading up to the enactment of a law,[51] as well as any illogical or counter-intuitive conclusions in the decision-making process.[52]

Here, the numerous overtly racist statements from legislators demonstrate that Congress departed from normal procedures and substantive conclusions. The 1920s were the first and only era in which Congress openly relied on eugenics when passing legislation, and the Undesirable Aliens Act was driven by views of immigration control as a means of racial engineering akin to horse breeding. It is noteworthy that the racial vitriol expressed during the debates was directed almost exclusively at Mexicans, even though Canadians were also entering the United States in record numbers.[53] No legislator referred to Canadians as "mongrels" or complained that Canadians were "poisoning the American citizen."[54]

---

[51] *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013).

[52] *See, e.g., Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts").

[53] Exhibit G (Congressional Record, Feb. 16, 1929) at H3621 (stating that 81,506 Canadians entered the U.S. in 1928).

[54] *See* Exhibit I (*Deportation*, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926)) at 30; Exhibit G (Congressional Record, Feb. 16, 1929) at H3620.

Motion to Dismiss

– 15 –

1                        *          *          *

2          This record demonstrates that racial animus was a motivating factor in the

3   passage of the Undesirable Alien Act. As Professor Lytle Hernández testified, "the

4   illegal reentry provision of the 1929 law was intended to target Latinos."[55] For this

5   reason, Judge Du found that "racial animus was a strong motivating factor in the

6   passage of the Act of 1929." *Carrillo-Lopez* at *9; *see also Machic-Xiap* at *12

7   (characterizing the Undesirable Aliens Act as "serv[ing] two racist purposes"—it

8   "furthered nativists' desire to separate certain immigrants from the general

9   population by attaching criminal penalties like imprisonment" while at the same time

10  giving "southwestern agribusiness greater ability to exploit these immigrants" by

11  allowing farmers to use "the threat of deportation as leverage over this immigrant

12  labor").

13         In short, Congress was motivated by racial animus when it enacted the

14  Undesirable Alien Act and criminalized reentry.

15  **C.    The 1952 recodification did not cleanse the unlawful reentry statute of its
        racist origins.**

16         When Congress passed the INA in 1952, it recodified the Undesirable Alien

17  Act's criminalization of reentry at 8 U.S.C. § 1326. Section 1326 adopted the language

18  from the Undesirable Alien Act "almost word for word," *Carrillo-Lopez* at *7, while

19

[55] Exhibit E (Testimony of Professor Lytle Hernández) at 34.

Motion to Dismiss

– 16 –

1  other portions of the INA broadened the grounds for deportation and limited

2  discretionary relief from deportation. President Truman harshly criticized the INA,

3  noting it was "most unfortunate" that the bill "would impose harsher restrictions and

4  greatly increase the number of cases deserving equitable relief" while at the same time

5  "narrow[ing] the circle of those who can obtain relief from the letter of the law."[56]

6      The 1952 Congress was aware of the disparate impact the criminalization of

7  reentry had on Latinxs, and it was aware of its racist underpinnings—but it engaged

8  with neither and overrode President Truman's veto, which explicitly called out the

9  law's discriminatory intent. The only meaningful change Congress made to the

10  statute was expanding it (at the behest of Deputy Attorney General Payton Ford, who

11  included the racial slur "wetback" in his request) to cover those who—like Mr.

12  Portillo-Orozco—are "found in" the United States. *See* 8 U.S.C. § 1326(a)(2).

13      Recodification does not automatically reset legislative intent. While it's

14  possible for recodification of a racially-motivated law to cure the original law's

15  discriminatory intent, that happens only where the legislature actively engages with

16  the prior statue and makes substantive changes. *See Abbott v. Perez*, 138 S. Ct. 2305

17  (2018).

18

19

---

[56] Exhibit O (President Truman's statement on "Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952) at 9.

This intuitive understanding of legislative intent is reflected in Supreme Court case law: "It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." *U.S. v. Ryder*, 110 U.S. 729, 740 (1884). "[W]e do not presume that the revision worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *Keene Corp. v. U.S.*, 508 U.S. 200, 209 (1993) (cleaned up).

As Judge Du noted in *Carrillo-Lopez*, "a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Id.* at *10 (citing *Hunter v. Underwood*, 471 U.S. 222, 232–33 (1985) (finding that when a provision's original enactment was clearly motivated by racial animus, later changes did not "legitimate[]" the provision); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (Sotomayor, J., concurring) (noting that "many laws and policies in this country have had some history of racial animus" and citing to *U.S. v. Fordice*, 505 U.S. 717, 729 (1992) for the proposition that "policies that are 'traceable' to a State's *de jure* racial segregation and that still 'have discriminatory effects' offend the Equal Protection Clause).

While the Supreme Court upheld the recodification of a racially-discriminatory law in *Abbott*, it did so only because the legislature actively engaged with the prior statute and made substantive changes. The Supreme Court upheld a 2013

Motion to Dismiss

– 18 –

redistricting plan that replaced a 2011 plan after the 2011 plan was found to have been enacted with discriminatory intent. The crucial distinction here is that, in *Abbott*, the 2013 legislature enacted an entirely new redistricting plan explicitly created to "fix the problems identified" (i.e., the discriminatory intent behind the 2011 plan), 138 S. Ct. at 2329, whereas §1326 was nearly identical to the original unlawful reentry statute.

The Supreme Court made clear in *Abbott* that the legislature's original intent remains relevant to determining the intent of the reenacting legislature "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the" reenacting legislature. *Id.* at 2327.[57]  In that particular case, the Supreme Court found the reenacting legislature lacked discriminatory intent precisely because of the way that it responded to the challenged provision, i.e., the fact that the 2013 legislature had taken care "'not to incorporate … any legal defects'" from the 2011 plan. *Abbott* at 2325 (quoting *Perry v. Perez*, 565 U.S. 388, 394 (2012)). In so doing, the Supreme Court stressed that the legislature "did not reenact the plan previously

---

[57] To the extent *Abbott* suggests any kind of presumption of a legislature's good faith, such presumption is limited to redistricting cases. *See Abbott*, 138 S. Ct. at 2324 ("'in assessing the sufficiency of a challenge ***to a districting plan***,' a court 'must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus' … [a]nd the 'good faith of the legislature must be presumed'" (citing *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995) (emphasis added)). As Judge Du notes, both *Abbott* and *Miller* justify this presumption on the complexity of redistricting—and there is no reason to believe such a presumption would carry over to a less complex statutory scheme, particularly where it has been shown that the original legislation was motivated by racial animus and the reenacting legislation is nearly identical. *Carrillo-Lopez* at *10 n.21.

1 passed by its 2011 predecessor" and therefore had not "carried forward the effects of

2 any discriminatory intent on the part of the 2011 Legislature." *Id*. The Supreme Court

3 concluded: "***Under these circumstances,*** there can be no doubt about what matters: It

4 is the intent of the 2013 Legislature." *Id*. (emphasis added).

5       With regard to §1326, the 1952 Congress—unlike the legislature in *Abbott*—did

6 not engage with the disparate impact or discriminatory purpose behind the original

7 legislation. Rather, it recodified a racist law without debate, altering it only to make it

8 more punitive, and knowingly "carried forward the effects" of the Act's

9 discriminatory intent (i.e., the disparate impact on Latinxs).

10       *Abbott* does not shield reenacting legislation from scrutiny where the legislature

11 passes a nearly-identical law without acknowledging, much less addressing, the prior

12 legislation's discriminatory motive or disparate effect. When Congress carries forward

13 legislation that was motivated by racial animus and has produced racially-disparate

14 results (and does so over a presidential veto explicitly calling out the racism of the

15 legislation), it takes no mental gymnastics to find that racial animus remained a

16 motivating factor.

17       The 1952 Congress's recodification of the Undesirable Aliens Act's unlawful

18 reentry statute—without debate on (and with full knowledge of) the statute's

19

discriminatory intent and disparate impact—establishes discriminatory intent under

*Arlington Heights*.[58]

**D.    The 1952 Congress acted with a discriminatory purpose when it recodified the provision of the Undesirable Aliens Act criminalizing reentry.**

In addition to the failure to address (much less repudiate) the discriminatory

intent behind the original unlawful reentry statute, there is significant

contemporaneous evidence that the 1952 Congress itself acted with discriminatory

intent in recodifying that statute. Applying the *Arlington Heights* factors to the 1952

recodification of §1326, it's clear racial animus was a motivating factor.

**1.    The first factor (the law's historical background) shows a discriminatory purpose because the racism of 1929 had not dissipated in 1952.**

The racial animus underpinning the Undesirable Aliens Act of 1929 informs

the 1952 Congress's recodification of the unlawful reentry provision. In *Carrillo-*

*Lopez*, Judge Du rightly "incorporate[d] by reference this prior evidence as evidence

of the historical background motivating the passage of Section 1326 in 1952." *Id.* at *9.

The anti-Latinx racism that motivated Congress in 1929 did not dissipate over

the years leading up to the passage of the INA in 1952. White supremacy was alive and

well throughout this time. Schools were segregated, *see, e.g., Westminster Sch. Dist. Of*

---

[58] In *Carrillo-Lopez*, Judge Du suggested, without deciding, that she "might be persuaded that the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint." *Id.* at *9.

1   *Orange Cty. v. Mendez*, 161 F.2d 774, 781 (9th Cir. 1947) (holding that the

2   "segregation of school children of Mexican descent" violated the Fourteenth

3   Amendment), and anti-miscegenation laws were on the books in numerous states, *see*

4   *Loving v. Virginia*, 388 U.S. 1, 7 (1967) (noting a state court had, in 1955, upheld an

5   anti-miscegenation law as "an endorsement of the doctrine of White Supremacy" and

6   an attempt to prevent "a mongrel breed of citizens").

7        Between 1929 and 1952, there were two major historical events bearing on the

8   Latinx population: the "repatriation drives" of the Great Depression and the

9   subsequent "Bracero Program." Both events demonstrate the United States' intent

10   to prevent Latinxs' permanent settlement and to maintain control over a temporary

11   and exploitable Latinx workforce.

12        The so-called "repatriation drives" carried out during the Great Depression

13   amounted to a government-led campaign of intimidation and coercion against the

14   Latinx population in the United States. As Professor Gonzalez O'Brien testified,

15   "this was a campaign that was meant to fuel voluntary re-patronization … driven by a

16   sense of the threat of deportation or the threat of additional penalties if those

17   individuals did not return to Mexico."[59] The campaign achieved its purpose, driving

18   millions of Latinxs—many, if not most, of whom were U.S. citizens—out of the

19

---

[59] Exhibit E (Testimony of Professor Gonzalez O'Brien) at 87.

Motion to Dismiss

United States. California has since apologized to the "estimated two million people of Mexican ancestry [who] were forcibly relocated to Mexico, approximately 1.2 million of whom had been born in the United States."[60]

Not long after this mass expulsion of Latinxs, the United States entered World War II, finding itself in need of cheap labor. In 1942, the United States started the Mexican Farm Labor Program, also known as "Operation Bracero" or the "Bracero Program." The idea was to funnel Latinx labor into the United States on a legal and temporary basis, while ensuring decent wages and humane treatment for the laborers. But the reality was that Braceros were lured to the United States only to be brutalized. They were subjected to medical inspections that required them to strip naked and involved invasive inspections and "being gassed systematically with DDT."[61]  The protections they were promised were routinely ignored.[62] They were exploited and subjected to literally back-breaking labor precisely because of their race. As Professor Lytle Hernández testified, the Braceros were mistreated because of the stereotype "that they, as a racial group, um, were more stout and close to the ground and sort of

---

[60] California Apology Act for the 1930s Mexican Repatriation Program (effective January 1, 2006), available at https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=GOV&division=1.&title=2.&part=&chapter=8.5.&article=
[61] Exhibit E (Testimony of Professor Lytle Hernández) at 76–77.
[62] Exhibit E (Testimony of Professor Lytle Hernández) at 78.

1    fit for this kind of labor, and so they didn't need the accoutrement that others did."[63]

2    When they were no longer needed, they were sent back to Mexico.[64]

3        Both the "repatriation drives" of the Great Depression and the subsequent

4    "Bracero Program" demonstrate that anti-Latinx racism remained prevalent in the

5    years leading up to the passage of the INA in 1952. This history of racism manifested

6    itself in countless other ways over the years, including the 1943 Sleepy Lagoon Trial in

7    Los Angeles (a mass murder trial of 22 Latinx defendants, during which a sheriff's

8    captain testified that "the Mexican element" had an innate "desire to use a knife or

9    some other lethal weapon … his desire is to kill, or, at least, let blood") and the

10    subsequent Zoot Suit Riots (10 days during which mobs of U.S. servicemen in Los

11    Angeles took to the streets and beat Latinx youths with impunity).[65]

12    _____

[63] Exhibit E (Testimony of Professor Lytle Hernández) at 78.

13    [64] In 1948, a plane returning Braceros to Mexico crashed in central California, killing all of the
100 people onboard. News accounts gave the names of the crew and an immigration officer—and

14    listed the others simply as "deportees." *Passengers on doomed 1948 flight, their names now emerge
from shadows*, Los Angeles Times (July 10, 2013), available at https://www.latimes.com/local/la-

15    me-deportees-guthrie-20130710-dto-htmlstory.html. This inspired Woody Guthrie to write his
classic song "Deportee":

16    Oh, the sky-plane caught fire over Los Gatos Canyon,
A fireball of lightning that shook all our hills.

17    Who are all these friends who are falling like dry leaves?
The radio said, "They're just deportees."

18    Goodbye to my Juan, goodbye Roselita,
Adios mis amigos, Jesús y María.

19    You won't have a name when you ride the big airplane,
All they will call you will be "deportees."

[65] *See Zoot Suit Riots: After 75 years, L.A. looks back on a violent summer*, Los Angeles Times (June

Motion to Dismiss
– 24 –

1    This anti-Latinx racism remained prevalent in 1952, as evidenced by

2    Congress's passage of Senate Bill 1851 (the so-called "Wetback Bill") that year. This

3    bill's passage is particularly probative for two reasons: first, it was passed by the same

4    Congress that, just two months later, would recodify the unlawful reentry provision of

5    the Undesirable Aliens Act; and second, it shared the aim of preventing unlawful

6    immigration (its stated purpose was to "assist in preventing aliens from entering or

7    remaining in the United States illegally.").[66]

8    The 1952 Congress's debate and passage of the Wetback Bill is relevant

9    historical background demonstrating the open racism of the legislature that would

10    enact §1326 only two months later. As Professor Gonzalez O'Brien testified,

11    "throughout the debate [on the bill], Mexican undocumented entrants [were]

12    regularly referenced as wetbacks," the debate focused on the "wetback problem,"

13    and legislators suggested that individuals "may be criminals because they are

14    wetbacks."[67] The fact that the 1952 Congress openly used the racial slur "wetback"

15    to refer to Mexicans—while debating the "Wetback Bill"—is illustrative of the open

16    racial animus of the 1952 Congress.

17

18

19    4, 2018), available at https://www.latimes.com/local/lanow/la-me-ln-zoot-suit-riots-anniversary-20180604-story.html.

[66] Pub. L. No. 82-283, 66 Stat. 26 (1952).

[67] Exhibit E (Testimony of Professor Gonzalez O'Brien) at 97–98, 107.

Motion to Dismiss

1    Professor Gonzalez O'Brien testified that the "term 'wetback' is one that is

2    racially derogatory, was recognized as being racially derogatory at the time," and

3    "across the period of the 1940s and 1950s [was] associated … almost synonymous

4    with Mexicans."[68] "[W]hile the use of racial slurs, epithets, or other derogatory

5    language does not alone prove discriminatory intent, it is evidence that official action

6    may be motivated by such an unlawful purpose." *La Union del Pueblo Entero v. Ross*,

7    353 F. Supp.3d 381, 395 (D. Md. 2018). As Judge Du found in *Carrillo-Lopez*, the use

8    of the term "wetback" "evidences the racial environment and rhetoric in 1952, even

9    among high-ranking government officials and committees, specifically with regard to

10    Mexican and Latinx people." *Id.* at *13.

11    **2.    The second factor (events leading up to the law) shows a**
        **discriminatory purpose because the 1952 Congress passed related**

12        **legislation using racial slurs.**

13    The specific sequence of events leading to the 1952 Congress's recodification

14    of the Undesirable Aliens Act's unlawful reentry provision is troubling for two

15    reasons. First, the same Congress passed the "Wetback Bill" two months prior.

16    Second, Deputy Attorney General Peyton Ford wrote to the Chairman of the

17    Committee on the Judiciary on behalf of the Department of Justice, included the racial

18    slur "wetback," and requested the one and only substantive change to the statute—

19

---

[68] Exhibit E (Testimony of Professor Gonzalez O'Brien) at 89.

the expansion of the law to cover those "found in" the United States.[69] As the letter

makes clear, this change was expressly designed to make it easier for the government

to establish venue in criminal prosecutions.[70]

Deputy Attorney General Ford was not some fringe figure shooting off a letter

to his representative. He was the second-highest-ranking Department of Justice

official and was providing "the views of the Department of Justice."[71] Based on his

request alone (the congressional record does not appear to contain any other

comment on what is now §1326), the 1952 Congress expanded the unlawful reentry

statute so that venue would lie wherever a reentering immigrant was found. (But for

this expansion, the government would have no grounds to prosecute Mr. Portillo-

Orozco in this district.)

As Judge Du found in *Carrillo-Lopez*, this sequence of events demonstrates that

"[t]he 1952 Congress's silence does not evince a neutral viewpoint, but worked to

expand the enforceability of an admittedly racist law." *Id.* at *14.

---

[69] Exhibit P (Statement of Peyton Ford, Deputy Attorney General, May 14, 1951).

[70] Exhibit P at 6 ("This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act.").

[71] Exhibit P at 1.

### 3.  The third factor (legislative history) shows a discriminatory purpose because the 1952 Congress overturned a presidential veto calling out the INA's racism.

The 1952 Congress's racial animus is demonstrated by its overriding of President Truman's veto of the INA, which explicitly called out the racism of the Act.

On June 25, 1952, President Truman vetoed the INA and issued a veto statement.[72] He condemned the INA as "legislation which would perpetuate injustices of long standing" and "intensify the repressive and inhumane aspects of our immigration procedures."[73] He expressed dismay that so much of the INA "would continue, practically without change" discriminatory immigration laws.[74] He admonished that it was "the time to shake off this dead weight of past mistakes … time to develop a decent policy of immigration … and a true reflection of the ideals we stand for, at home and abroad."[75]

Two days after President Truman's statement, Congress overrode the veto and passed the INA.

Congress's passage of the INA over a presidential veto explicitly calling out the law for its racism is evidence of racial animus. As Judge Du found in *Carrillo-Lopez*,

---

[72] Exhibit O (President Truman's statement on "Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952).
[73] Exhibit O at 3.
[74] Exhibit O at 4.
[75] Exhibit O at 6.

"Congress' failure to heed President Truman's call to 'reimagine' immigration while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Id.* at *12.

### 4. The fourth factor (deviations from procedural norms) shows a discriminatory purpose because the 1952 Congress knew about §1326's racist origins—and said nothing.

As noted above, examining whether the legislature departed from "normal procedures or substantive conclusions" requires courts to consider any procedural irregularities leading up to the enactment of a law, as well as any illogical or counter-intuitive conclusions in the decision-making process.

Here, there were three such departures:

First, Congress's passage of the "Wetback Bill" (two months prior to recodifying the unlawful reentry statute) represents an illogical and counter-intuitive irregularity leading up to the enactment of §1326. This is because of the incongruity between the stated intent of the "Wetback Bill" and Congress's actual intent, as demonstrated by the language of the statute. While the bill's stated aim was to prevent "aliens from entering or remaining in the United States illegally," the law worked to shield employers from prosecution ("for the purposes of this section, employment … shall not constitute harboring").[76] It was obvious then as now that the

---

[76] Pub. L. No. 82-283, 66 Stat. 26 (1952).

1  lure of employment was the primary reason Latinxs were coming to the United States

2  unlawfully. For many reasons, employers are vastly more responsive to deterrence

3  than impoverished immigrants, and the most effective means of deterring "aliens

4  from entering or remaining in the United States illegally" is therefore to punish

5  employers who hire such immigrants. The import here is that the 1952 Congress,

6  despite its avowed interest in limiting unlawful immigration, was in fact furthering the

7  racist compromise introduced by the 1929 Congress: preserving American industry's

8  access to cheap and exploitable Latinx labor while punishing the Latinxs who provided

9  that labor. As Judge Du found in *Carrillo-Lopez*, the 1952 Congress's "criminalization

10  of Mexican immigrant laborers while shielding employers evidences the racially

11  discriminatory motives and intent of the same Congress who enacted Section 1326

12  only two months later." *Id.* at *15.

13    Second, the 1952 Congress's decision to expand the reach of the unlawful

14  reentry statute based on a letter from the Deputy Attorney General that referred to

15  Mexicans as "wetbacks" is procedurally irregular and evidences racial animus.

16    Third, the 1952 Congress's lack of debate regarding §1326, when Congress

17  knew of the law's disparate impact on Latinxs and when other provisions of the INA

18  were discussed and debated at length, is an irregularity demonstrating Congress's

19  discriminatory intent. This is particularly the case given that the 1952 Congress

expanded the grounds for deportation, restricted discretionary relief from

1    deportation, and expanded the scope of the unlawful reentry provision. As Professor

2    Gonzalez O'Brien testified, the lack of discussion of the unlawful reentry provision of

3    the INA suggests an acceptance of its racist history.[77] The 1952 Congress had full

4    knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised

5    up to 99% of the tens of thousands of individuals prosecuted and convicted in the

6    years following the law's passage.[78] Despite having every opportunity to examine the

7    unlawful reentry provision's history and clarify it was recodifying that provision for a

8    legitimate, non-discriminatory purpose, the 1952 Congress ignored the express racism

9    behind the original statute and its disparate impact on Latinxs. As Judge Du found in

10   *Carrillo-Lopez*, "[w]hen considered in comparison with the express debate over other

11   racially problematic predecessor statutes, Congress' silence here weighs in favor or

12   establishing" the 1952 Congress was motivated by racial animus—particularly given

13   "its decision to expand the grounds for deportation and carceral punishment, despite

14   its knowledge of the disparate impact of this provision on Mexican and Latinx

15   people." *Id.* at *11, 15.

16

17

---

18   [77] Exhibit E (Testimony of Professor Gonzalez O'Brien) at 181.
     [78] Hernández, *supra*, at 138–39 n.6 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years

19   1931–36); Exhibit C (Declaration of Professor Lytle Hernández) at 8. *See also* Exhibit Q (S. Rep.
     No. 1515, Apr. 20, 1950) at 654–56 (regarding testimony from the Immigration and
     Naturalization Service that refers exclusively to Mexicans and recommends carrying forward
     the1929 legislation).

1                              *          *          *

2          When the 1952 Congress recodified the Undesirable Aliens Act's unlawful

3   reentry statute at 8 U.S.C. § 1326, it chose to ignore the original statute's racist

4   history and to expand a law it knew disparately impacted Latinxs. In so doing, the

5   1952 Congress was motivated at least in part by racial animus. As Professor Gonzalez

6   O'Brien testified, Congress's passage of §1326 "was largely driven by the same things

7   that drove the original codification of [the unlawful reentry statute]; and that was, in

8   part, a desire to control access to Mexican labor, and also a tendency to view

9   Mexicans, individuals from south of the Rio Grande, and at least in the terms of the

10  1950s, the wetback, as a problematic population"—leading Professor Gonzalez

11  O'Brien to give his professional opinion that the 1952 Congress's recodification of the

12  unlawful reentry statute was "motivated by racial animus."[79]

13          For these reasons, Judge Du rightly concluded "the totality of the evidence

14  shows that the same factors motivating the passage of [the unlawful reentry statute] in

15  1929 were present in 1952"—meaning, "racial animus was at least one motivating

16  factor behind the enactment of Section 1326." *Carrillo-Lopez* at \*10, 16.

17

18

19

---

[79] Exhibit E (Testimony of Professor Gonzalez O'Brien) at 129–30.

**E.    As Mr. Portillo-Orozco has demonstrated disparate impact and discriminatory purpose, the burden shifts to the government.**

Because Mr. Portillo-Orozco has met his burden under *Arlington Heights*, the burden shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." 429 U.S. at 270 n.21.

The government has conceded the Undesirable Aliens Act was motivated by racial animus. The 1952 Congress did not address that history when it recodified the criminalization of reentry in §1326, and its enactment of that statute was itself motivated by discriminatory intent. While Congress has since amended §1326 to make it more punitive, it has never addressed the racism that motivated the original unlawful reentry statute or its recodification. As Judge Du found, "at no point has Congress confronted the racist, nativist roots of Section 1326." *Carrillo-Lopez* at *24. There is no evidence that the Congress acted with nondiscriminatory motivation— i.e., that "the same decision would have resulted even had the impermissible purpose not been considered"—when it first criminalized reentry in the Undesirable Aliens Act or when it recodified that statute at §1326.

# IV.    Conclusion

When Judge Du found §1326 violates the Fifth Amendment's equal protection guarantee, she made the morally and legally correct decision. Congress was undoubtedly motivated by racial animus when it first criminalized reentry in 1929 as a compromise designed to keep "rat men" from poisoning the Anglo-American gene pool while still allowing American industry to exploit cheap Latinx labor. Twenty-three years later, Congress was again motivated by racial animus when it doubled down on this racist deal by making it easier for the government to lock up Latinxs while exempting employers from prosecution.

This racist law has been on the books for nearly a century, and it has done incalculable damage. It has stigmatized and degraded countless Latinxs and torn their families apart. It gave rise to the Trump Administration's "zero tolerance" policy of prosecuting "100 percent of illegal Southwest Border crossings"[80] (illustrating that the racial animus of the 1920s and 1950s remains with us, as it is visa overstays—not border crossings—that account for the vast majority of unlawful immigration to the

---

[80] Dept. of Justice, "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," May 7, 2018, available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-discussing-immigration-enforcement-actions. This same "zero tolerance" policy was behind the intentional and unconscionable separation of thousands of Latinx children from their families. *See, e.g., Ms. L. v. U.S. Immigration and Customs Enforcement*, 302 F.Supp.3d 1149 (S.D. Cal. 2018).

United States[81]) and Operation Streamline's en masse hearings with dozens of brown-skinned men shackled and crammed into federal courtrooms to be jointly arraigned, pled, and sentenced—all in one hearing:[82]



This mockery of due process and our founding ideals has sparked a reckoning with the sordid history of our criminal immigration laws. In December 2019, Representative Chuy García of Illinois (who was born in Mexico, the son of a farm laborer who came to the U.S. under the "Bracero Program") introduced the New

[81] *See The Real Illegal Immigration Crisis Isn't on the Southern Border*, The Atlantic, Apr. 19, 2019 (noting that, for the past decade, "visa overstays in the United States have outnumbered border crossings by a ratio of about 2 to 1").

[82] *See Assembly-Line Justice: A Review of Operation Streamline*, University of California, Berkeley Law School, The Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity, Jan. 2010 ("The sheer number of defendants requires nearly all judges to combine the initial appearance, arraignment, plea, and sentencing into one en masse hearing. Many Operation Streamline defendants complete the entire criminal proceeding—meeting with counsel, making an initial appearance, pleading guilty, and being sentenced after waiving a presentence report—in a single day. Criminal Justice Act (CJA) Panel attorneys serve as counsel for the majority of defendants and are appointed to represent up to 80 clients in one hearing, which can foreclose individualized representation.").

Way Forward Act, which would repeal §1326. In his introductory remarks on the House floor, Representative García recognized that "[a]t this moment in history, we are called to uphold our values of compassion, common humanity, and racial justice." He argued that "[o]ur communities deserve dignity, restoration and repair, not further criminalization." And he urged support for his bill to "correct[] racial and anti-immigrant injustices embedded in our immigration laws, many of which have enabled the Trump Administration's inhumane assault on non-citizens in the United States and at our southern border."[83]

Representative García's eloquent appeal recognizes that §1326 was motivated by anti-Latinx racism and continues to visit injustice on Latinxs in our community. The Constitution entrusts the judiciary with the responsibility of scrutinizing legislation motivated by racial animus to ensure that such injustices are thwarted.

Mr. Portillo-Orozco respectfully asks that the Court find that §1326 violates the Fifth Amendment's equal protection guarantee and dismiss the indictment against him.

Dated: May 2, 2022

<div style="margin-left:40%">

Federal Defenders of Eastern Washington & Idaho
Attorneys for Paulino Portillo-Orozco

s/ Christina Wong
Christina Wong, NY #5528146
</div>

---

[83] *Congressional Record*, Dec. 10, 2019, at E1571–72, available at https://www.congress.gov/116/crec/2019/12/10/CREC-2019-12-10-pt1-PgE1571-4.pdf.

1

2

**Service Certificate**

3        I certify that on May 2, 2022, I electronically filed the foregoing with the

4 Clerk of the Court using the CM/ECF System, which will notify Assistant United

5 States Attorney Michael Ellis.

6                                    <u>s/ Christina Wong</u>
                                    Christina Wong, NY #5528146

7

8

9

10

11

12

13

14

15

16

17

18

19