# Exhibit C

# Declaration of Professor Lytle Hernández

Declaration of Professor Kelly Lytle Hernandez
on the History of USC 1325/1326

I have been asked to make this declaration to explain my understanding of the history of USC 1326 and USC 1326. I am a professor of History, African American Studies, and Urban Planning at UCLA where I hold The Thomas E. Lifka Endowed Chair in History. One of the nation's leading experts on race, immigration, and mass incarceration, I am the author of the award-winning books, *Migra! A History of the U.S. Border Patrol* (University of California Press, 2010), and *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles* (University of North Carolina Press, 2017). *City of Inmates* recently won the 2018 James Rawley Prize from the Organization of American Historians, 2018 Athearn Prize from the Western Historical Association, the 2018 John Hope Franklin Book Prize from the American Studies Association, and the 2018 American Book Award. Both books, *Migra!* And *City of Inmates*, address the history of criminalizing undocumented immigration to the United States. In 2019, I was named a MacArthur "Genius" Fellow for my historical and contemporary work.

In 1929, the U.S. Congress first criminalized the act of entering the United States without authorization, making entering the United States without authorization a misdemeanor and re-entering the United States without authorization after deportation a felony. Although no racial group was named in the 1929 legislation, racial animus motivated the bill's author. Moreover, the politics of white supremacy dominated the politics of immigration control at the time. On these grounds, the individual racial animus of the original bill's author and the prevailing politics of immigration legislation leading into and during the 1920s, the criminalization of unauthorized entry was a racially motivated act. Unsurprisingly, the new law delivered racially disparate outcomes.

The modern system of federal immigration control began during the 1870s. Before that, states and cities largely set immigration policy. But the Panic of 1873 triggered a deep economic recession across the United States that exacerbated what scholars call "anti-Chinese sentiment" in the U.S. West, leading to the 1882 Chinese Exclusion Act, which prohibited Chinese laborers from entering the United States for ten years. The act was a more restricted measure than demanded by hardline westerners, but as one of the new law's staunchest advocates explained, "If this law is strictly enforced it will not be many years before the [Chinese] race will, in all probability, be extinct in this country." Ten years later, Congress passed the Geary Act, which extended the ban on Chinese laborers and required all lawful Chinese immigrants to register with federal authorities. Those who failed to do so would be subject to arrest, imprisonment and then deportation. The 1892 Geary Act marked a sweeping expansion of U.S. immigration control. Prior to the Geary Act, Congress had adopted legislation to prohibit certain groups of persons from entering the United States. By 1891, Chinese laborers and all prostitutes, convicts, "lunatics," "idiots," contract laborers, and those "liable to become public charges" were categorically prohibited from entering the United States. All such persons were to be stopped at immigration stations, interrogated, and denied entry into the country. But after the Geary Act, immigrants who had already established residence within the United States were subject to forced removal. Therefore, the

1

broadened the basic framework of U.S. immigration control beyond the nation's borders to include deportation from within the United States.

Since 1892, U.S. authorities have deported or otherwise forcibly removed more than fifty million people from the United States. In the early years of deportation, many of the nation's deportees were Chinese immigrants. The Chinese Mounted Guard, which was established to police unlawful Chinese immigration in border regions, apprehended and deported thousands. But, by 1924, the focus of exclusion at U.S. borders and removal from within U.S. borders changed, turning toward the rising number of Mexican immigrants entering the United States.

Few Mexicans immigrated to the United States at the close of the nineteenth century. But a period of land privatization in Mexico paired with agricultural development in the southwestern United States soon triggered an unprecedented wave of mass labor migration between Mexico and the United States. By the early 1900s, tens of thousands of Mexicans entered the United States every year. Most arrived in search of work and engaged in seasonal migrations between work in the United States and home in Mexico. By the 1920s, Mexicans made more than 1 million border crossings every year and emerged as the majority low-wage workforce in many southwestern industries. As the president of the Los Angeles Chamber of Commerce explained, "We are totally dependent . . . upon Mexico for agricultural and industrial common or casual labor. It is our only source of supply."

But Mexican immigrants were more than common and casual laborers. Living and working in the United States, Mexicans formed communities and associations, built homes, raised families, joined labor unions, and established everything from newspapers and businesses to bands and baseball teams. Building what has been described as MexAmerica and raising the first generation of Mexican Americans, Mexican immigrants made full and permanent lives for themselves and their children—an increasing number of whom were U.S.-born citizens—in the United States.

The rise of MexAmerica made Mexican immigration a hot topic in the U.S. Congress during the 1920s. In a decade now remembered as the "Tribal Twenties"—a time when the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics—many representatives, especially those popularly known as "Nativists," hoped to restrict and even end immigration to the United States from every region of the world other than western Europe.[3] In the past, they argued, slaveholders had made a terrible mistake by importing Africans to the country in the blind pursuit of profit. Nothing could be done to undo the tragedy of slavery—the introduction of Africans to the country, that is—but, they hoped, new immigration laws would limit the future peopling of the United States.

For them, the 1882 Chinese Exclusion Act had been just the beginning of an enduring effort to restrict immigration to the United States. In the years that followed the 1882 law, Congress further restricted who could legally enter the United States. By 1917, Congress had banned all Asian immigration to the United States and also categorically prohibited all prostitutes, convicts, anarchists, epileptics, "lunatics," "idiots," contract laborers, and those
.

2

"liable to become public charges" from entering the United States. Moreover, Congress adopted a fee structure and literacy test designed to keep the poor and illiterate from entering the country. Many Nativists still wanted more. In particular, they demanded a comprehensive whites-only immigration system

In 1924, the Nativists scored a major legislative victory with the passage of the National Origins Act. The law affirmed all previous immigration restrictions, such as the total bans on contract laborers, epileptics, anarchists, polygamists, criminals, and all Asian immigrants. The 1924 law also required all immigrants to submit to inspection at a U.S. immigration station, where they would have to pass a literacy test and a health exam and pay $18 in head taxes and visa fees before legally entering the country. Only western Europeans, they believed, would be able to pass such exams and pay the fees required for legal entry into the United States. Finally, the 1924 National Origins Act also established a system of national quotas that limited the total number of immigrants allowed to enter the country each year. The quota system constituted what historian John Higham has described as a "Nordic victory" by narrowing the pathways of legal immigration to allow only a particular portion of the world's population to enter: 96 percent of all quota slots were reserved for European immigrants.

However, to pass the National Origins Act, the Nativists in Congress made a painful compromise. Employers across the southwestern United States vehemently opposed the quota system. At a time when U.S. immigration authorities counted 100,000 Mexicans crossing the border each year, the quota system would limit Mexican immigration to a few hundred border crossers annually. The quota system threatened to cut the surge of Mexican immigration to a trickle. But industries in the West had become "dependent" on Mexican labor, explained employers, who voiced their opposition to the new law. Under pressure from these employers, a bloc of congressmen from western states refused to vote for a comprehensive quota system, forcing the Nativists in Congress to choose between accepting a Mexican quota exemption or passing no immigration law at all. The westerners won. Therefore, the 1924 National Origins Act exempted all immigrants from the Western Hemisphere, including Mexican immigrants, from the quota system. So long as Mexican immigrants complied with the administrative requirements for legal entry—submitted to inspection at an official port of entry, passed the literacy test and health exam, and paid the $18 head tax—an unlimited number of them could enter the United States each year.

Nativists chafed at the Western Hemisphere exemption. As one congressmen complained during the 1924 hearings, "what is the use of closing the front door to keep out undesirables from Europe when you permit Mexicans to come in here by the back door by the thousands and thousands?" After the passage of the 1924 National Origins Act, the nativists campaigned to add Mexico's migrant workers to the quota system. Mexico was a nation of mongrels, they argued. As such, Mexicans were unassimilable racial inferiors and unrestricted Mexican immigration jeopardized the core objective of the National Origins Act. "The continuance of a desirable character of citizenship is the fundamental purpose of our immigration laws. Incidental to this are the avoidance of social and racial problems, the upholding of American standards of wages and living, and the maintenance of order. All of

3

these purposes will be violated by increasing the Mexican population of the country," explained Congressmen John C. Box (Texas) who co-sponsored a 1926 bill to limit Mexican immigration to the United States. The growers defeated the 1926 Box Bill but the nativists tried again in 1928 arguing that the exemption for Mexican workers needed to be terminated because, as they forebodingly warned, "Our great Southwest is rapidly creating for itself a new racial problem, as our old South did when it imported slave labor from Africa."

Throughout their debates with the nativists, southwestern growers fully agreed with the notion that Mexico's immigrant workers presented a "racial problem" and thereby conceded the nativists' point that Mexican immigration posed a threat to American society.  As S. Parker Frisselle of the California Farm Bureau Federation explained during the 1926 hearings, "with the Mexican comes a social problem…It is a serious one.  It comes into our schools, it comes into our cities, and it comes into our whole civilization in California."  But after assuring the nativists that "We, gentlemen, are just as anxious as you are not to build the civilization of California or any other western district upon a Mexican foundation," the growers countered the nativists' call to place a numerical limit upon Mexican immigration to the United States by arguing that without unrestricted access to Mexican workers, the rising empire of agribusinesses in the American southwest would turn to ruin. Instead of ending Mexican immigration, they offered the nativists a promise. "We, in California," vowed Friselle, "think we can handle that social problem."  For, as another agribusinessman from Texas testified, "if we could not control the Mexicans and they would take this country it would be better to keep them out, but we can and do control them."

The pledge that "we can and do control them" referred to the social world of agribusiness in the U.S.-Mexico borderlands. Agribusinessmen and the demands of their enterprises dominated the political, social, and cultural life of borderland communities as the racialized organization of work refracted throughout community life. Whites held land or managed workers while Mexicanos harvested, plowed, picked, tended, reaped, and migrated. As Devra Weber, Paul Schuster Taylor, and others have detailed, the racialized divisions in California were so crude that "the owners and top managers were white: foremen, contractors and workers were Mexican."[8] In Texas, one young white farmer explained that white landholders and tenants lived a life of leisure because "we have the Mexicans here and don't work."[9]  The hierarchy between Anglo-American landowners, white managers, and Mexicano workers reverberated throughout the region where highly racialized practices of social segregation, political repression, and community violence accompanied the patterns of economic exploitation that locked the region's large Mexicano population in low-wage work. From Texas to California, white and Mexicano children attended separate and unequal schools.  Poll taxes and political bosses effectively disenfranchised Mexicano voters.  Mexicans had limited employment options outside of agriculture. Police violence against Mexicanos was common. And, where it was most extensive, "No Negroes, Mexicans, or Dogs" signs were posted on restaurant doors.

While the quota system reduced immigration from most corners of the world Mexican immigration soared. In fact, by the end of the 1920s Mexico became one of the leading sources

4

of immigration to the United States. This unnerved the Nativists. Mexicans, they hollered, were "peons," "mongrels," and "racially unfit for [U.S.] citizenship." Mexican immigration, they believed, threatened to degrade the nation's "Aryan" stock. It needed to be stopped. But according to the 1924 Immigration Act, an unlimited number of Mexicans would be allowed to enter the United States every year. All Mexicans had to do was travel to an official port of entry anywhere along the U.S.–Mexico border, submit to inspection, pass the literacy test and health exam, and pay—or have paid by their employers—the $18 entrance fee. Mexicans did this one million times during the 1920s. On top of this, many Mexicans crossed the border without officially registering for legal entry. They evaded the expense and inconvenience of legal entry and, instead, simply crossed the border along its many desolate stretches between ports of entry. The U.S. Immigration Service estimated that Mexicans made an estimated half-million unauthorized border crossings during the 1920s. With western industries continuing to expand, every indicator suggested that Mexican immigration, both authorized and unauthorized, would only increase in the years ahead. The continued threat of Mexico's "mongrels" migrating into the United States undermined the Nativists' Nordic victory of 1924.

But the Nativists in Congress never gave up their quest to end Mexican immigration to the United States. After the passage of the 1924 Immigration Act, they proposed bill after bill attempting to add Mexico to the quota system. Between 1926 and 1930, Congress repeatedly debated the future of Mexican immigration into the United States. Each time, employers—namely those in the business of industrial agriculture in the U.S. West—protested. S. Parker Frisselle was the first person to testify before Congress when the Mexican quota hearings began in January 1926. An influential farmer and lobbyist from California, Frisselle was a leading voice among the dozens of agribusiness owners who journeyed to Congress to support unrestricted Mexican immigration to the United States. Immigration control, Frisselle conceded, was one of Congress's most sacred duties. Immigrants, he explained, were permanent residents who, in time, became U.S. citizens. Congress, therefore, rightly passed laws to restrict, limit, and filter immigration to the United States. Thus Frisselle supported the Nativists' pursuit of immigration restriction. "We, gentlemen," he testified, "are just as anxious as you are not to build the civilization of California or any other western district upon a Mexican foundation."

However, argued Frisselle, Mexicans were not immigrants. "There is . . . in the minds of many the thought that the Mexican is an immigrant," explained Frisselle. That thought was wrong, he assured. "The Mexican," he testified, "does not remain." "He always goes back," promised Frisselle. "The Mexican," continued Frisselle, "is a 'homer.' Like the pigeon he goes home to roost." On this promise that Mexicans were "bird[s] of passage" who would, at the end of each season, return to Mexico, never settling north of the border and never becoming Mexican American, the western lobby defeated the 1926 bill to cap Mexican immigration to the United States.

Two years later, as Congress continued to debate Mexican immigration, George C. Clements, a lobbyist from Los Angeles, emerged as a leader among the western agribusinessmen. As the director of the Agricultural Bureau of the Los Angeles Chamber of Commerce, Clements's full-time occupation was the protection and advancement of

5

the interests of agribusiness. An evangelist for unrestricted Mexican immigration, he traveled around Los Angeles and throughout the southwest lecturing on the topic. He also provided research to congressional committees, consulted with California's governors, organized industry wide meetings, and vigorously confronted all challenges to the organization of agriculture in the West. When liberal academics challenged the inequities of agribusiness, Clements picked apart their claims in counterstudies and editorials. Indefatigable, Clements was a driving force behind the western lobby for unrestricted Mexican immigration.

According to Clements, just one fact mattered in the Mexican immigration debate. The fact, as Clements put it, was that Mexican immigrants were "swallows": like migrating birds, they would never permanently settle within the United States. Mexicans, he explained, "have no intention of becoming citizens within the United States." A Mexican would not settle in the United States because "his homing instincts take him back to Mexico." But if the homing instinct of Mexico's swallows were ever to falter, "we need not be burdened with his keep." Estimating that 80 percent of California's Mexican working population had entered the country without authorization, Clements assured worried Nativists that Mexicans could be forcibly removed from the country. "He is deportable," Clements wrote, lectured, and testified. Mexican deportability, argued Clements, was a social fact that Congress could depend on when voting to leave Mexican immigration unrestricted.

Clements also asked the opponents of unrestricted Mexican immigration to carefully consider one question before voting against it. That question, according to Clements, had nothing to do with Mexicans. It had to do with blacks. "The one problem which should give us pause is the negro problem," explained Clements. "I warn you. American business has no conscience. If the Mexican is denied us, the [Puerto Rican] negro will come," he cautioned. Knowing his adversary well, Clements baited the nervous Nativists of the Tribal Twenties. "Which do you choose," he asked, Mexico's deportable birds of passage or Puerto Rican Negroes who, as citizens, would leave the edge of U.S. empire to settle within the final frontier of Anglo-America? "When once here always here," warned Clements; the Puerto Rican Negro would pose "a continual social problem and a growing menace. You can not deport him." The only real question, therefore, was whether Congress would open the Anglo-American West to permanent black settlement or make its peace with Mexico's birds of passage. Itinerant, impermanent, and disposable Mexican labor migration, he offered, was the only real solution for the development of the American West.

But by 1929, the western promises of Mexican impermanence had worn thin. Mexican immigration was soaring. Ten percent of the Mexican population already lived north of the border. How many more Mexicans would cross the border to settle in the United States? Nativists in Congress pounded the western employers for answers, charging them with recklessly courting the nation's racial doom with unrestricted migration from Mexico. Western employers refused to budge. At this moment, amid the escalating conflict between Anglo-American employers in the West and anxious Nativists in Congress, a senator from Dixie proposed a compromise.

A proud and unreconstructed white supremacist, Coleman Livingston Blease hailed from the hills of South Carolina. When Blease was elected to the state assembly in 1889, his first legislative proposal was a bill to racially segregate all railroad cars in South Carolina. The bill failed, but in the years ahead, Blease successfully rode a rising wave of rabid antiblack racism to the South Carolina governorship and then, in 1925, to the U.S. Senate. The self-appointed "political heir" to "Pitchfork" Ben Tillman, Senator Blease was, according to one biographer, touched by a strain of "Negro-phobia that knew no bounds."

When Blease marched into Congress in 1925, he was prepared to battle any perceived threat to white supremacy. He was against the idea of a world court because he opposed any "court where we [Anglo-Americans] are to sit side by side with a full blooded 'nigger.'" In this case, Blease referred to the possibility of a Haitian judge being appointed to the world court. In terms of immigration control, Blease campaigned on 100 percent Americanism, and once in Congress, he feverishly opposed any attempt to roll back immigration restriction and pushed Congress to prohibit the U.S. government from hiring noncitizens. The bill was rejected three times. He also proposed limiting the voting rights of naturalized citizens. This, too, Congress rejected. But in early 1929, as Congress was locked in an unending debate over the rise of Mexican immigration to the United States, it was Senator Coleman Livingston Blease from South Carolina who negotiated a settlement between the congressional Nativists and western agribusinessmen during the Tribal Twenties.

Blease shifted the conversation to controlling unauthorized Mexican migration rather than capping authorized migration. Citing the large number of unauthorized border crossings made by Mexicans each year, Senator Blease proposed criminalizing unlawful entry into the United States. Mexicans regularly crossed the border without authorization, making them particularly vulnerable to prosecution and incarceration according to Blease's bill. According to Senator Blease's proposal, "unlawfully entering the country" would be a misdemeanor punishable by a $1,000 fine and/or up to one year in prison, while unlawfully returning to the United States after deportation would be a felony punishable by a $1,000 fine and/or up to two years in prison. As written, the new law would affect any immigrant who unlawfully entered the United States, but it was introduced into Congress as a measure to control and punish unlawful Mexican immigrants, in particular. To this, the western agribusinessmen registered no protest. Mexican deportability, after all, was an asset to agribusinessmen in search of a temporary labor force. As Frisselle put it in 1926, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Like deportation, the criminalization of unauthorized entry only strengthened the position of agribusiness owners. On March 4, 1929, Congress passed Blease's bill. Within one year, Blease's law was delivering results.

With stunning precision, the criminalization of unlawful entry caged thousands of Mexico's proverbial birds of passage. Within one year of enforcement, U.S. attorneys prosecuted 7,001 cases of unlawful entry. By 1939, they had prosecuted more than 44,000 cases. In no year did the U.S. attorneys' conviction rate fall below 93 percent of all immigration cases.

Taking custody of individuals convicted on federal immigration charges, the U.S. Bureau of Prisons reported that Mexicans never comprised less than 84.6 percent of all imprisoned immigrants. Some years, Mexicans comprised 99 percent of immigration offenders. Therefore, by the end of the 1930s, tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States. With 71 percent of all Mexican federal prisoners charged with immigration crimes, no other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act—sent more Mexicans to federal prison during those years.

Clearly, the archival record marks the criminalization of unauthorized entry as a racially motivated act that quickly delivered racially disparate outcomes.

DATED: August 2, 2020

Kelly Lytle Hernandez