# EXHIBIT F

# Hearings before the Subcommittee of the Committee on Appropriations

# U.S. Senate

# March 25, 1953

# DEPARTMENTS OF STATE, JUSTICE, AND COMMERCE APPROPRIATIONS FOR 1954

## HEARINGS

BEFORE THE

### SUBCOMMITTEE OF THE
### COMMITTEE ON APPROPRIATIONS
### UNITED STATES SENATE

EIGHTY-THIRD CONGRESS

FIRST SESSION

ON

# H. R. 4974

MAKING APPROPRIATIONS FOR THE DEPARTMENTS OF
STATE, JUSTICE, AND COMMERCE FOR THE FISCAL
YEAR ENDING JUNE 30, 1954

Printed for the use of the Committee on Appropriations



UNITED STATES
GOVERNMENT PRINTING OFFICE
31759        WASHINGTON : 1953

(The information referred to follows:)

*Fees and expenses of witnesses, Justice—Summary analysis of estimate*

| | |
|---|---|
| Regular | $1, 000, 000 |
| Supplemental | 270, 000 |
| **Total** | 1, 270, 000 |
| Reductions | --------- |
| Additions | --------- |
| Adjustment in base | --------- |
| Base for 1954 | 1, 270, 000 |
| Estimate for 1954 | 1, 200, 000 |
| Decrease over base | −70, 000 |
| Decrease over 1953 appropriation | −70, 000 |

Mr. ANDRETTA. That is right, sir. We have no control over the number of the witnesses or the travel they make, and the distances they come or anything like that. We have to pay the regular statutory fees. This is an appropriation where we invariably come back for a supplemental request because there is no way really to estimate in advance how much we are going to need.

For example, this year we have $1 million, and there was a supplemental submitted to the House of $270,000 which, you will recall, the Attorney General withdrew. We are going to try to find the money somewhere else. There is nothing much we can do about that.

Chairman BRIDGES. If there is nothing further, thank you very much, Mr. Andretta.

### IMMIGRATION AND NATURALIZATION SERVICE

### STATEMENTS OF A. R. MACKEY, COMMISSIONER; E. A. LOUGHRAN, ASSISTANT; W. F. KELLY, ASSISTANT; A. C. DEVANEY, ASSISTANT; AND DALE FRANCIS, BUDGET OFFICER, IMMIGRATION AND NATURALIZATION SERVICE

#### AMOUNT REQUESTED

Chairman BRIDGES. We will take up the Bureau of Immigration and Naturalization Service at this time. We have with us Mr. A. R. Mackey, the Commissioner, and several associates. Will you introduce them please, Commissioner?

Mr. MACKEY. This is Allen C. Devaney, Assistant Commissioner of Inspections and Examinations; Willard F. Kelly, Assistant Commissioner, Border Patrol and Detention; E. A. Loughran, assistant; and his assistant, Dale Francis.

Chairman BRIDGES. Thank you. In 1954, the official Truman estimate was $48,400,000, and the revised estimate is $42,725,000.

Mr. MACKEY. That is correct.

Chairman BRIDGES. A cut of $5,675,000 and 716 jobs. The revised estimate exceeds the 1953 allowance by $2,446,000 and 466 jobs.

We will place in the record at this point your analysis of revised estimate.

218   STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954

(The information referred to follows:)

SALARIES AND EXPENSES, IMMIGRATION AND NATURALIZATION SERVICE

*Analysis of revised estimate by activity*

| Activity | 1953 adjusted | | 1954 revised | | Increase or decrease over 1953 adjusted | |
|---|---|---|---|---|---|---|
| | Positions | Amount | Positions | Amount | Positions | Amount |
| 1. Inspection for admission into the United States | 1,929 | $10,924,100 | 2,095 | $11,829,900 | +166 | +$905,800 |
| 2. Detention and deportation | 1,493 | 11,047,300 | 1,583 | 11,132,000 | +90 | +84,700 |
| 3. Naturalization | 699 | 3,161,700 | 828 | 3,719,200 | +129 | +557,500 |
| 4. Patrol for detection of illegal entry | 1,220 | 6,809,300 | 1,209 | 6,744,300 | −11 | −65,000 |
| 5. Investigating aliens' status | 1,380 | 6,976,000 | 1,472 | 7,550,500 | +92 | +574,500 |
| 6. Alien registration | | 853,700 | | 780,700 | | −73,000 |
| 7. Executive direction | 9 | 57,100 | 9 | 59,600 | | +2,500 |
| 8. Central administrative services | 504 | 2,157,600 | 504 | 2,157,600 | | |
| Total | 7,234 | 41,986,800 | 7,700 | 43,973,800 | +466 | +1,987,000 |
| Deduct quarters and subsistence furnished | | −24,100 | | −24,100 | | |
| Reimbursements for services performed | | −109,000 | | −343,700 | | −234,700 |
| Payments received from non-Federal sources | | −1,574,700 | | −881,000 | | +693,700 |
| Appropriation or estimate | 7,234 | 40,279,000 | 7,700 | 42,725,000 | +466 | +2,446,000 |

*Analysis of decrease*

| Activity | Personal services | | Other items | Total | |
|---|---|---|---|---|---|
| | Positions | Amount | | Positions | Amount |
| 1. Inspection for admission into the United States (reduction represents 2 months delay in Public Law 414 program; elimination of funds for space rental; adjustment to provide for equipping new employees; elimination of training; elimination of field administrative item; elimination of item for erecting 3 border stations, and reduction in advisory personnel) | −9 | −$99,900 | −$47,800 | −9 | −$147,700 |
| 2. Detention and deportation (reduction represents elimination of trainlift to Mexico; elimination of Ellis Island power conversion; elimination of entire increase for hearing officers, supporting clerical personnel and related expenses; elimination of field-administrative item; reduction in detention-camp operations; reduction in supervisory personnel, and reduction in amount to offset detention expenses shifted from carriers to the Government) | −103 | −498,500 | −1,781,600 | −103 | −2,280,100 |
| 3. Naturalization (reduction represents 2 months delay in Public Law 414 program; elimination of funds for space rental; adjustment to provide for equipping new employees; reduction in supervisory personnel, and elimination of field administrative item) | −3 | −88,900 | −4,800 | −3 | −93,700 |
| 4. Patrol for prevention and detection of illegal entry (reduction represents elimination of entire increase in personnel and related expenses; reduction of $100,000 in amount for automobile replacements; elimination of all funds for aircraft replacement, and elimination from base of all funds for operating aircraft including salaries and expenses) | −346 | −1,371,000 | −395,000 | −346 | −1,766,000 |
| 5. Investigating aliens' status (reduction represents a cutback in proposed Public Law 414 program including (a) a cut of 177 investigators, (b) 2 months delay in balance of program, (c) elimination of funds for space rental and (d) adjustment to provide for equipping new employees, reduction in supervisory personnel, and elimination of field administrative item) | −255 | −1,172,100 | −142,400 | −255 | −1,314,500 |
| 6. Alien registration (reduction represents approximately 25 man-years of temporary employment and a reduced amount for contractual services) | | 51,800 | 21,200 | | 73,000 |
| 7. Executive direction | | | | | |
| 8. Central administrative services | | | | | |
| Total reductions | −716 | −3,282,200 | −2,392,800 | −716 | −5,675,000 |
| Increases reflected, 1954 printed budget | +1,182 | +5,372,200 | +2,748,800 | +1,182 | +8,121,000 |
| Increase reflected, revised estimate | +466 | +2,090,000 | +356,000 | +466 | +2,446,000 |

ORIGINAL SUMMARY ANALYSIS OF ESTIMATE

*Salaries and expenses, Immigration and Naturalization Service*

| | | |
|---|---:|---:|
| Appropriation, 1953: | | |
| Regular _____ | | $40,399,000 |
| Transferred to "Salaries and expenses, general administration, Justice" _____ | | —120,000 |
| Adjusted appropriation for 1953_____ | | 40,279,000 |
| Reductions (—): | | |
| 1. Inspection for admission into the United States_____ | $39,400 | |
| 2. Detention and deportation_____ | 924,800 | |
| 3. Naturalization_____ | 6,600 | |
| 4. Patrol for prevention of illegal entry__ | 139,100 | |
| 5. Investigating aliens' status_____ | 200,700 | |
| | | —$1,310,600 |
| Additions (+): | | |
| 2. Detention and deportation_____ | 540,800 | |
| 5. Investigating aliens' status_____ | 279,100 | |
| | | +819,900 |
| Adjustment in base (net) _____ | | —490,700 |
| Base for 1954_____ | | 39,788,300 |
| Estimate for 1954_____ | | 48,400,000 |
| Increase over base_____ | | 8,611,700 |
| Increase from total appropriation, 1953_____ | | 8,001,000 |

Mr. Mackey, you have a statement, I understand. Do you want to highlight that for the committee, and then file the full statement as part of the record?

Mr. MACKEY. I should like to.

If it pleases the committee, I would like to take up each major activity of the Service, comment briefly upon what was accomplished with the money appropriated last year, mention the principal changes brought about by the new Immigration and Nationality Act, and explain our needs under that act for the fiscal year 1954.

### ACCOMPLISHMENTS OF INSPECTION SERVICE

On Inspection, as to accomplishments, since the end of World War II the number of entries of aliens and citizens into the United States has increased by leaps and bounds. More than doubling the World War II figure, the volume during the past year for the first time passed the 100-million mark. There were 107 million entries at ports of entry into the United States, including United States citizens, aliens coming for the first time for permanent residence, and aliens returning to their homes, crewmen, and other aliens coming for temporary periods. By comparison with the prior year, there was an increase of 15 percent in alien entries and an increase of 10 percent in citizen entries.

### ALIENS ADMITTED

Last year immigration officers boarded 98,000 arriving aircraft and 62,000 ships. There were admitted to the United States 781,602 aliens consisting of 516,082 nonimmigrants entering for temporary periods and 265,520 aliens admitted for permanent residence.

Senator DIRKSEN. Will you pause there a minute?

Mr. MACKEY. Yes, sir.

Senator DIRKSEN. You say 781,000 aliens and 516,000 visitors and 265,000 for permanent admittance?

### TOTAL ETHNIC GERMANS ADMITTED

Mr. MACKEY. That is right. The number admitted for legal permanent residence is the highest since 1929, due chiefly to the admission of 42,786 ethnic Germans under section 12 of the Displaced Persons Act of 1948, as amended.

Senator DIRKSEN. Those were expellees?

Mr. MACKEY. That is right, as well as 45 percent increase in nonquota immigration.

### ALIENS EXCLUDED

The number of nonimmigrant arrivals exceeded any single year since the first records of 1908. It exceeded the prior year by 11 percent, reflected chiefly increases in temporary visitors, transits, and foreign government officials. During the year 565 stowaways were found on arriving vessels and 16,167 aliens were held for exclusion and given hearings by boards of special inquiry. During the same period 5,050 aliens were excluded from the United States.

Senator DIRKSEN. Let us get back to the 11-percent increase in temporary transits and foreign government officials.

Mr. MACKEY. Yes, sir.

### ENTRY OF FOREIGN GOVERNMENT OFFICIALS

Senator DIRKSEN. How much increase was there in foreign government officials coming in?

Mr. MACKEY. Do we have the data available, Mr. Loughran?

Mr. LOUGHRAN. Mr. Devaney has it.

Senator DIRKSEN. Is that broken down by countries?

Mr. MACKEY. Mr. Devaney has the data.

Mr. DEVANEY. There is the complete breakdown, Senator, by countries [indicating].

Senator DIRKSEN. There is nothing confidential in that, is there?

Mr. MACKEY. No, sir.

Chairman BRIDGES. If you will furnish a copy, we will make that a part of the record.

STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954   221

(The information referred to follows:)

TABLE 3.—*Aliens admitted, by classes under the immigration laws, years ended June 30, 1948 to 1952*

[Data exclude travelers between continental United States and insular possessions, border crossers, and agricultural and railway track laborers admittd from Mexico]

| Class | 1948 | 1949 | 1950 | 1951 | 1952 |
|---|---|---|---|---|---|
| Aliens admitted | 646,576 | 635,589 | 676,024 | 670,823 | 781,602 |
| Immigrants [1] | 170,570 | 188,317 | 249,187 | 205,717 | 265,520 |
| Quota immigrants | 92,526 | 113,046 | 197,460 | 156,547 | 194,247 |
| Nonquota immigrants | 78,044 | 75,271 | 51,727 | 49,170 | 71,273 |
| Husbands of United States citizens | 647 | 3,239 | 1,459 | 822 | 793 |
| Wives of United States citizens | 30,086 | 27,967 | 12,291 | 8,685 | 16,058 |
| Unmarried children of United States citizens | 6,097 | 4,648 | 2,525 | 1,955 | 2,464 |
| Natives of nonquota countries | 37,506 | 35,969 | 32,790 | 34,704 | 47,744 |
| Their wives | 316 | 282 | 278 | 337 | 455 |
| Their unmarried children | 146 | 143 | 170 | 233 | 209 |
| Ministers of religious denominations | 782 | 623 | 454 | 376 | 338 |
| Their wives | 367 | 244 | 147 | 129 | 96 |
| Their unmarried children | 443 | 366 | 232 | 228 | 146 |
| Professors of colleges, universities | 505 | 424 | 291 | 214 | 158 |
| Their wives | 238 | 212 | 124 | 113 | 68 |
| Their unmarried children | 254 | 233 | 188 | 130 | 71 |
| Women who had been United States citizens | 136 | 110 | 86 | 39 | 32 |
| Other nonquota immigrants | 521 | 811 | 692 | 1,205 | 2,641 |
| Nonimmigrants | 476,006 | 447,272 | 426,837 | 465,106 | 516,082 |
| Government officials, their families, attendants, servants, and employees | 16,822 | 13,722 | 13,975 | 20,881 | 22,267 |
| Temporary visitors for business | 78,876 | 73,338 | 67,984 | 83,995 | 86,745 |
| Temporary visitors for pleasure | 206,107 | 225,745 | 219,810 | 230,210 | 269,606 |
| In continuous transit through the United States | 124,780 | 81,615 | 68,640 | 72,027 | 77,899 |
| To carry on trade under treaty | 711 | 632 | 766 | 850 | 791 |
| Members of international organizations | 4,059 | 4,723 | 5,010 | 5,526 | 5,137 |
| Returning residents | 32,464 | 36,984 | 40,903 | 44,212 | 44,980 |
| Students | 11,914 | 10,481 | 9,744 | 7,355 | 8,613 |
| Other nonimmigrants | 273 | 32 | 5 | 50 | 44 |

[1] An immigrant is defined in statistics of the Service as an alien admitted for permanent residence, or as an addition to the population. Therefore, students who are admitted for temporary periods and returning resident aliens who have once been counted as immigrants are included with nonimmigrants, although sec. 4 defines such classes as immigrants.

TABLE 16.—*Nonimmigrant aliens admitted, by classes under the immigration laws and country or region of birth; year ended June 30, 1952*

| Country or region of birth | Number admitted | Government officials | Temporary visitors for— | | In transit | To carry on trade | Returning residents | Students | International officials | Other classes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Business | Pleasure | | | | | | |
| All countries | 516,082 | 22,267 | 86,745 | 269,606 | 77,899 | 791 | 44,980 | 8,613 | 5,137 | 44 |
| Europe | 203,781 | 9,145 | 43,224 | 76,180 | 42,953 | 622 | 27,628 | 1,569 | 2,459 | 1 |
| Austria | 3,523 | 84 | 1,088 | 1,504 | 362 | 12 | 396 | 39 | 38 | |
| Belgium | 5,815 | 629 | 1,119 | 1,416 | 1,757 | 21 | 679 | 27 | 167 | |
| Bulgaria | 153 | 4 | 34 | 66 | 18 | | 20 | 6 | 5 | |
| Czechoslovakia | 1,809 | 63 | 408 | 726 | 214 | 1 | 293 | 43 | 61 | |
| Denmark | 5,634 | 325 | 1,094 | 1,824 | 1,732 | 45 | 491 | 35 | 88 | |
| Estonia | 210 | 9 | 31 | 65 | 56 | | 37 | 10 | 2 | |
| Finland | 1,931 | 47 | 418 | 527 | 744 | 25 | 148 | 16 | 6 | |
| France | 18,427 | 1,351 | 5,401 | 4,465 | 3,668 | 11 | 2,794 | 123 | 614 | |
| Germany | 17,268 | 249 | 5,855 | 6,171 | 1,723 | 8 | 2,991 | 212 | 59 | |
| Greece | 3,097 | 324 | 584 | 1,040 | 504 | 21 | 372 | 217 | 35 | |
| Hungary | 1,530 | 60 | 330 | 652 | 217 | | 225 | 34 | 12 | |
| Ireland | 4,077 | 61 | 366 | 1,585 | 639 | 1 | 1,403 | 6 | 16 | |
| Italy | 10,042 | 803 | 2,461 | 2,851 | 1,954 | 52 | 1,763 | 86 | 72 | |
| Latvia | 394 | 8 | 94 | 172 | 52 | | 62 | 4 | 2 | |
| Lithuania | 807 | 8 | 187 | 475 | 70 | | 64 | 3 | | |
| Netherlands | 11,212 | 638 | 2,705 | 3,289 | 3,364 | 1 | 971 | 99 | 145 | |
| Norway | 6,991 | 439 | 1,215 | 1,833 | 2,406 | 24 | 860 | 85 | 69 | |
| Poland | 7,886 | 216 | 1,689 | 4,052 | 669 | 8 | 1,113 | 99 | 40 | |
| Portugal | 1,382 | 223 | 223 | 311 | 250 | 1 | 335 | 23 | 16 | |
| Rumania | 2,076 | 36 | 457 | 1,163 | 212 | 6 | 154 | 39 | 9 | |
| Spain | 10,382 | 178 | 1,583 | 4,906 | 2,995 | 60 | 482 | 92 | 86 | |
| Sweden | 5,857 | 218 | 1,474 | 2,356 | 768 | | 943 | 33 | 65 | |
| Switzerland | 5,528 | 152 | 1,502 | 1,823 | 942 | 67 | 953 | 29 | 60 | |
| United Kingdom: | | | | | | | | | | |
| England | 52,702 | 2,070 | 9,764 | 21,257 | 11,888 | 207 | 6,911 | 64 | 541 | |
| North Ireland | 1,866 | 31 | 177 | 878 | 355 | 4 | 403 | 6 | 12 | |
| Scotland | 12,303 | 173 | 1,326 | 5,736 | 3,296 | 24 | 1,694 | 10 | 44 | |
| Wales | 1,725 | 56 | 257 | 780 | 352 | 10 | 256 | 2 | 12 | |
| U. S. S. R | 5,023 | 242 | 673 | 3,099 | 453 | 4 | 400 | 28 | 123 | 1 |
| Yugoslavia | 952 | 335 | 111 | 225 | 95 | 2 | 149 | 9 | 26 | |
| Other Europe | 3,179 | 113 | 598 | 933 | 1,138 | 7 | 266 | 90 | 34 | |
| Asia | 27,404 | 3,230 | 7,478 | 5,140 | 5,348 | 31 | 2,987 | 2,545 | 645 | |
| China | 4,688 | 157 | 547 | 462 | 2,791 | 8 | 134 | 391 | 198 | |
| India | 2,717 | 252 | 901 | 581 | 417 | 10 | 100 | 315 | 141 | |
| Japan | 6,034 | 345 | 2,011 | 563 | 958 | | 1,841 | 307 | 9 | |
| Palestine | 641 | 12 | 140 | 266 | 69 | | 50 | 100 | 4 | |
| Philippines | 3,600 | 586 | 1,199 | 817 | 109 | | 417 | 393 | 79 | |
| Other Asia | 9,724 | 1,878 | 2,680 | 2,451 | 1,004 | 13 | 445 | 1,039 | 214 | |
| North America | 224,229 | 4,962 | 25,817 | 156,781 | 21,424 | 54 | 11,454 | 2,806 | 888 | 43 |
| Canada | 87,623 | 935 | 8,996 | 64,882 | 9,943 | 6 | 1,570 | 980 | 268 | 43 |
| Mexico | 32,120 | 2,128 | 5,468 | 19,851 | 3,575 | 2 | 469 | 449 | 178 | |
| West Indies | 82,855 | 1,071 | 9,334 | 56,967 | 6,445 | 24 | 7,891 | 817 | 306 | |
| Central America | 13,189 | 715 | 1,436 | 8,006 | 998 | 16 | 1,370 | 535 | 113 | |
| Other North America | 8,442 | 113 | 583 | 7,075 | 463 | 6 | 154 | 25 | 23 | |
| South America | 41,385 | 3,157 | 6,303 | 23,996 | 4,039 | 53 | 1,756 | 1,380 | 701 | |
| Africa | 3,763 | 343 | 1,097 | 1,220 | 409 | 14 | 336 | 214 | 130 | |
| Australia and New Zealand | 8,093 | 394 | 2,297 | 2,588 | 2,023 | 6 | 559 | 85 | 141 | |
| Other countries | 7,427 | 1,036 | 529 | 3,701 | 1,703 | 11 | 260 | 14 | 173 | |

Mr. MACKEY. Over 76,000 reentry permits were issued or extended as compared with some 69,000 the year before.

### NEEDS UNDER PUBLIC LAW 414

Next is the 1954 needs for Public Law 414.

The detailed effects of the Immigration and Nationality Act upon the activity of inspection are spelled out in the formal justifications before you. At this point I shall touch only upon those which I consider the most important from the standpoint of effect upon budgetary requirements.

As to visa petitions, under the Immigration and Nationality Act, all immigrants coming to the United States, with comparatively few exceptions, must be beneficiaries of approved visa petitions filed in their behalf with the Immigration and Naturalization Service. This represents a new trend in immigration legislation inasmuch as these persons formerly made their applications for immigration visas directly to American consuls, officials of the State Department, in foreign countries where they desired to obtain their visas. Since any delay in processing these applications would seriously affect the normal flow of immigration into the United States and work considerable hardship on petitioners, these petitions must be examined and processed as quickly after receipt as possible.

Senator DIRKSEN. You mean there is a departure from the old system of getting your visa approved by a consul abroad?

Mr. MACKEY. That is right; 50 percent of the quota is made available on a preference status to those aliens of particular skills and training.

Senator DIRKSEN. Where do they apply for the visa?

### VISA GRANTED BY PETITION

Mr. MACKEY. They apply by way of petition to the Immigration and Naturalization Service.

Senator DIRKSEN. To the Service, not to the consul?

Mr. MACKEY. That is right. After they have applied to us and we have cleared with other Government agencies as to the need of that type of skill or labor in the United States, then we pass on the petition, either approving or disapproving it.

Senator DIRKSEN. I am thinking of the administrative picture. Do you have a man abroad in these offices?

Mr. MACKEY. No, sir; I do not.

Senator DIRKSEN. Those all come in by mail?

Mr. MACKEY. Most of them come in by mail, and they are handled by Mr. Devaney and his Division.

Mr. DEVANEY. May I say, Senator, that the petition as to the first 50 percent under the annual quota for each year has to be filed by an employer in the United States. As to the remaining preference groups relating to American citizens, lawfully resident aliens, and brothers and sisters, the remaining part of the quota, most of those cases are in the United States, so the petition is likewise executed and filed with us.

### BACKLOG IN PETITIONS

I might say on that particular point, if I may, while we are dealing with visa petitions, that we have had a tremendous backlog. At the close of February, we had on hand 11,500 visa petitions backlog.

Senator DIRKSEN. In that 50 percent area?

Mr. DEVANEY. No; in the whole area of petitions. That is due to the fact that we have been operating under the Immigration and Nationality Act since December under our old fund. We have been taking steps to cut our proceedings to handle it. But I do not see how we can, unless additional funds are made available.

Senator DIRKSEN. Go ahead, Mr. Mackey.

### EFFECT OF NEW LAW

Mr. MACKEY. Based upon statistical records reflecting the average of the past 5 fiscal years this new provision of law will add approximately 73,000 visa petitions to the annual workload of the Service. To handle this increase, we need 23 adjudicators and 23 clerks (pp. 60 and 61 of the justifications).

### INSPECTION AT PORTS OF ENTRY

On the inspection at ports of entry, under the Immigration and Nationality Act, new requirements and controls over the admission of alien seamen have been enacted. This legislation requires the inspection, in considerable detail, of every seaman applying for admission to the United States under all laws relating to the exclusion of aliens and the issuance of documents authorizing shore leave in appropriate cases. Neither of these requirements existed in earlier legislation. Since many of the larger ships arriving in the United States have crews as large as 1,200 men and remain in port for less than 24 hours, examination of these crewmen cannot be deferred. For this new work, as well as the additional time required for inspecting other arrivals at ports of entry in connection with new grounds for exclusion, there is required the time of 50 immigrant inspectors. However, the new law also establishes a procedure under which the secondary inspection will be accomplished by only 1 officer in contrast to prior procedure where 2 officers were required. This releases the time of 45 officers, so that the net increase required for inspection at ports of entry is 5 officers and 5 clerks. That is on pages 63 to 65 of the justifications.

### INSPECTIONS EN ROUTE

Senator MCCARRAN. Let me ask you right there, you have had inspectors on the vessels en route, have you not?

Mr. MACKEY. We have, Senator; yes, sir.

Senator MCCARRAN. And that facilitated the matter considerably, did it not?

Mr. MACKEY. It did, sir. We sat down with representatives of the steamship lines, as well as those representing the seamen's unions, and we worked out this procedure primarily to assist the lines in maintaining their sailing schedules. We placed inspectors on the ships and they would inspect the crew, both going abroad and returning to the United States, so that when the final inspection was made at the port of entry, the inspector had all of the information deemed necessary to make that final inspection.

Senator MCCARRAN. That worked out pretty well. At first it created quite a furor.

Mr. MACKEY. It did cause some misunderstanding. But as I say, we did sit down with the lines and the representatives of the seamen's unions and we were all in agreement as to this new procedure.

Senator MCCARRAN. I might say for the record and for the benefit of the committee that this provision was studied very closely and put in the law because seamen determined by evidence uncontradictable had been used as couriers for the Communist agencies abroad. They came to our country posing as seamen, and then some would jump

ship and become active participants in the Communist movement in this country. It was necessary to do something to try to prevent this. So this provision was put in the law. On the 24th of December, when the bill became effective, there was a temporary furor over it because some of the seamen on a French vessel were not permitted to land.

### EFFECT OF PROCEDURE

Mr. MACKEY. Right there, Senator McCarran, I should like to say that the beaches are clearer today of overstayed seamen than at any time in the last 20 years.

Senator McCARRAN. When you use the term "overstayed," you mean seamen who jump ship?

Mr. MACKEY. We mean those remaining longer than permitted by the law.

Senator DIRKSEN. How did you check it in other years?

Mr. MACKEY. In other years we had no powers under the then existing law.

Senator DIRKSEN. You have really no base against which to make a comparison, do you?

Mr. MACKEY. Yes, sir. We do not pick up as many remained longer seamen today. Under existing law, they are permitted to remain as long as their ship is in port, but in no case for a period of more than 29 days. Of course, in emergencies we extend that shore leave.

Senator DIRKSEN. In other years you had X number of arrivals of seamen, for example.

Mr. MACKEY. That is right.

Senator DIRKSEN. You had no check of the crews at departure?

Mr. MACKEY. A seaman cannot land for shore leave unless he is given a landing card by the inspector.

Senator DIRKSEN. But there is no good figure to indicate how many actually did jump ship and stay here in other years?

Mr. KELLY. Yes, sir.

### CHECK ON CREW LIST

Senator DIRKSEN. How did you check it?

Mr. DEVANEY. When a ship arrives, the incoming crew list shows the number of seamen on there. When the ship goes out, the master is required under law to submit changes in crews. That is one source of information of the number of seamen that deserted. It may be that they went out with some other ship. But, in addition to that, we know through the years, Senator, that the seaman route has been a favorite route for people to come here and stay. We know that from the deportation process.

Senator DIRKSEN. You had to take the master's word?

Mr. DEVANEY. Yes. There was a fine on him unless he carried out his responsibility under the law.

Senator DIRKSEN. I have had a good many come to me. At long last they had to disclose themselves through social security because their identity was revealed finally, and then I discovered that they were seamen who had jumped ship and had been in the country a good many years. I have always been curious as to how many there were

and how accurate your check was. You did not actually check them aboard ship when a vessel got ready to depart?

Mr. DEVANEY. No; unless they were unusual cases, the routine was not to check them out. It was a requirement on the master to give changes in the crew. The point on the seaman today, under the Immigration and Nationality Act under which we are operating today, it is the feeling of the Service, and I am sure shared by the Commissioner, that we have far better control today than we ever had in the seaman problem, simply because of a much closer inspection, and, too, we restrict them as to the type of entry they have. As the Commissioner says, only while the ship is in port. We try to keep most of them down to that. The others can stay as long as 29 days and reship on some other ship.

Mr. MACKEY. That is right.

Mr. DEVANEY. We know from the reports from our various districts that it is not as easy as it used to be to find overstayed seamen on the beaches.

Senator DIRKSEN. If the penalty on the matter is high enough, he will make sure he takes out the same crew he brings in.

### NOTIFICATION OF DISCHARGES

Mr. DEVANEY. That is right. Of course, the master cannot pay off a seaman today under the law or cannot discharge them unless he notifies the immigration officer he is going to do so. That, of course, is always a key as to whether or not the seaman may stay on here. Those things we did not have before under the old seaman law, but we have that today, and it is an effective weapon.

Senator DIRKSEN. You think it is a good thing?

Mr. DEVANEY. Very definitely.

Senator DIRKSEN. That is in contradistinction to some of these complaints and criticisms that were made in the first days when the new act became effective.

Mr. DEVANEY. Could I say a word to that, sir?

Senator DIRKSEN. I would like to have it, and I would like to have it in the record.

Mr. DEVANEY. As Mr. Mackey indicated, before the act went into effect, we met with the Transatlantic Passenger Conference. We knew, when the act went into effect on December 24, New York Harbor would be jammed with ships because we did not have the inspectors to do the job that we wanted to do and were required to do. So we put the inspectors on the ships.

Now, it is true that in the early days of that inspection process some of the officers perhaps were a little overzealous in the questioning; perhaps they did ask some of the women stewardesses on the ships whether they had ever engaged in certain immoral acts. As soon as we found that out—it was a perfectly proper question under the law— we asked them to use a little discretion in putting such questions to the seamen.

### COMPLAINTS UNDER ACT

In addition there were complaints that under the Immigration and Nationality Act, even if a seaman after arrival here had been here more than 29 days or over the required period of 29 days, the Immi-

gration Service, if they were sick, were picking them up and putting them on the island and in our various detention quarters.

I checked on the cases personally that were represented to us by the unions. I was unable to find one case of one seaman where that was involved. As soon as it was ascertained, in the one particular case they were referring to, he was placed in a Public Health Hospital. The statute limits the stay for seamen in the United States to 29 days, with no extensions permitted, and we want it that way for the simple reason that, if you formalize a proceeding and allow a seaman to apply for extension perforce of time, he will get it himself because we do not have the staff to handle it.

If an emergency comes up, saying if he has to stay for hospital treatment or if there is some other type of emergency, administratively we give him a little time to leave the United States.

Senator DIRKSEN. But very particularly the charge was made that because your inspectors and field operators would ask the seaman, "Are you a Red? have you ever belonged to the Communist Party? have you ever been identified with this or that?" that there was a complete demoralization of the maritime service. You do not agree with that at all?

Mr. DEVANEY. I do not, definitely, sir.

Senator DIRKSEN. Let us look at the other side of the picture for the record. The allegation was made that there was inconvenience, damage and pecuniary loss to ship owners, and to shipping generally, because of the time involved in going through the inspection there of the crew. What is your comment on that?

### INSPECTION WORKLOAD ANTICIPATED

Mr. DEVANEY. As I said, we met with the Transatlantic Passenger Conference at the start of the Immigration and Nationality Act, and I met with them the other day, with operator representatives of the service, in New York, and they said they were extremely pleased with the way the whole project had been handled, that is our "ride the ship" project. We had to tell them for the summer months we could not continue the project for the reason we do not have a sufficient number of inspectors.

It is anticipated that this year because of the coronation we will perhaps have the largest inspection work we have ever had in the New York District. We have two new ships, carrying in the neighborhood of 1,500 to 2,000 passengers, with new crews to examine. Because of that, we are not going to attempt to ride the ships. That would be too many inspectors out of the port at one time. What we are going to try to do, if we do not get the additional help, is to milk employees off other areas of work and we do not like to do that because they are not experienced in this field of work.

Senator DIRKSEN. But assuming a modest increase in help, there will be no inconvenience to shipping and these allegations that have been made are actually without foundation.

Mr. DEVANEY. That is right, sir.

Senator McCARRAN. How about the seamen's unions, have you met with them?

Mr. DEVANEY. Yes, Senator.

228    STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954

### ENDORSEMENT BY UNIONS

Senator McCarran. What is the condition as to satisfaction there?

Mr. Devaney. There are two groups of unions, the International Seafarers Union with headquarters in London and representatives in the United States, and they deal with seamen on foreign flag ships, as distinguished from our ships.   We met with them and representatives of the State Department.   We told them what our plan was.   They first felt that perhaps we were being a little too harsh in the matter of allowing seamen to transship from one ship to another in the United States, but I definitely feel and not to draw out the testimony too long, that the representatives of the union, as you know, have endorsed the Immigration and Nationality Act.   There have been some few individual complaints, and we have begged them to bring those complaints to us, which they have done, and I think we have effectively handled them.

On the American flag ships, the Seafarers Union, with headquarters in San Francisco, they do have a problem and we have talked to representatives of both the Senate and House committees concerning the seamen who have been on American flag ships for upwards of 3 years. They have had security clearances, there is no problem there.   Most of them are family men.   This act does inflict somewhat of a hardship on them.   In some of the individual cases we may be able to give them relief under existing law, and we are attempting to do that.   As to other individual cases, it may call for legislation to help them.   But both committees are thoroughly familiar with that situation.

Chairman Bridges. You may proceed.

### CHANGE OF STATUS

Mr. Mackey. The new act provides for a mandatory change of status from permanent resident to nonimmigrant.   Section 247 of the new law requires change of status of lawfully permanent resident aliens to that of nonimmigrants if such aliens had at the time of entry or subsequently acquire an occupational status of Government official, treaty trade, or official of an international organization—unless the alien signs a waiver of his diplomatic rights and immunities.   Then, of course, his is thrown into the nonimmigrant status, which will require him to leave the United States as soon as his status has terminated.   We found that very effective and something which we needed for a long time.

Senator Dirksen. How many do you have in that category?

Mr. Devaney. I do not think at this point we can give you statistics, Senator, because there has been some question as to the applicability of the statute to certain individuals, those attached to the United Nations.

Senator Dirksen. Can you give us a guess?

### DIPLOMATIC STATUS

Mr. Devaney. It would be very much of a guess.   To my knowledge I would know in the neighborhood of 50 cases, but I am sure it is far in excess of that.   We are at this moment going through the records of the State Department, and our own records, to see what individuals

we can find from our own records that have been lawfully admitted to the United States for permanent residence, and who at the same time are enjoying a diplomatic status. As soon as we have compiled that, we intend to, of course, go into their individual cases.

The point is that they are arising at this time. When an individual applies for a reentry permit to the Service, and we find he is in a diplomatic category, we do not issue a permit to him, and he has to make up his mind as to what action he is going to take. That is the 50 cases I have in mind.

Senator DIRKSEN. I wondered, because you were asking for 12 adjudicators and 12 clerks.

### OTHER APPLICATION WORK

Mr. MACKEY. Other application work. Another new requirement under the Immigration and Nationality Act is that petitions must be filed for importation of nonimmigrant aliens:

1. Who are of distinguished merit and ability, or
2. Who are coming to perform temporary services or labor, or
3. Who are industrial trainees.

### REVOCATIONS OF VISA PETITIONS

Also, statutory authority has been provided for the first time for revocation of visa petitions which have been approved for immigrants and nonimmigrants. The new law enlarges the classes of aliens requiring permission to reapply for admission to the United States by adding (1) aliens removed as alien enemies and (2) aliens removed at Government expense in lieu of deportation. For these phases of the additional work and its central direction there are needed 10 adjudicators and 10 clerks. That is on pages 61 to 67 of the justifications.

### CENTRAL INDEX

As to the central index, the new law requires that there be established in the central office a central index of all persons admitted to the United States or excluded therefrom. This index is to be used primarily for security and other law-enforcement agencies of the Government. Under prior law, no record of admission was created in the cases of the vast majority of aliens crossing the land borders from Canada and Mexico.

The Service will be required to obtain information from aliens, variously estimated from two to ten million persons, to be indexed in the central office. Our estimate of the additional clerical personnel of 58 positions is based upon an estimated annual workload of 3,800,000 index cards consisting of 400,000 records of individual crewmen, 3,000,000 records of individual crossers from Canada, and 400,000 records of holders of border-crossing identification cards. The estimate provides only for the additional clerical time involved. No specific provision has been made for the additional time which inevitably will be required of officers. See pages 53 to 59 of the justifications.

Senator DIRKSEN. Three million and eight hundred thousand index cards?

Mr. MACKEY. Yes, sir.

230   STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954

Senator DIRKSEN. Four hundred thousand of individual crewmen?

Mr. MACKEY. That is right.

Senator DIRKSEN. Have you so much turnover that that is going to develop a permanent workload over a long period of time, or once the thing has been set up, the maintenance operation can be done with just a few people? You are asking for 58 here.

Mr. DEVANEY. In order to have the central index effective, Senator, you just cannot rest on your oars on the one entry made by the seaman, because if he switches from port to port, and if an intelligence agency wishes to know whether or not Joe Smith came into the United States, one card might show that he came in at New York on such and such a ship, and they might be interested in knowing whether or not he came in at New Orleans. It is a question of keeping the thing current on the vessel on which he entered plus the port he entered. That is why it will be a continuing operation.

Senator DIRKSEN. I am curious whether this is going to be a manual job or a tabulating machine job.

Mr. LOUGHRAN. It will be a manual job.

### BORDER CROSSERS

Senator DIRKSEN. What about the border crossers? They operate on 30-day cards; do they not?

Mr. MACKEY. In Canada and Mexico; yes.

Mr. DEVANEY. On the Canadian border, a Canadian citizen or a British citizen lawfully domiciled in Canada is not required to have a crossing card. The Canadians have resisted that definitely. We have not insisted on it.

Senator DIRKSEN. Does not everybody who comes across the bridge up there have to have a 30-day card?

Mr. DEVANEY. No. A Canadian citizen or British citizen domiciled in Canada, if he says to our inspector that he is bona fide, can enter the United States without documentation provided he is not to stay more than 6 months. On the Mexican border, we require it.

Senator DIRKSEN. How do you catch him if he does not go back?

Mr. DEVANEY. The only way is apprehension. If he attempts to visit one of our offices he has to furnish his change of address every so often under the Alien Registration Act. There are various ways. Through apprehension alone.

Senator DIRKSEN. He could get lost in farm work or industrial work today.

Mr. DEVANEY. Yes.

Senator MCCARRAN. On that subject, may I inquire about how many aliens one way or another are here illegally? Can you give us a fair estimate of that?

Mr. DEVANEY. I cannot.

Senator MCCARRAN. You would not attempt to?

Mr. DEVANEY. No, sir. I would not attempt to. I think it has been attempted in the past without any real justification for it. Senator, knowing the number of Mexicans alone that are crossing the border daily in an illegal status, and will continue to do it, undoubtedly, it would be an impossibility to estimate. I do not think anyone could.

Chairman BRIDGES. Do you have any record of the Puerto Ricans coming here?

Mr. Devaney. Only on a very limited manifest furnished by the airlines.

Chairman Bridges. They just come and go as they please?

Mr. Devaney. That is right.

Mr. Mackey. They are citizens of the United States.

### ENTRY OF SUBVERSIVES

Senator Dirksen. But Mexico and Canada as areas of entry—I am not speaking of Mexican people or Canadians, but as an area of entry—certainly could furnish us a lot of undesirables. If a man can put up a good front as he crosses the bridge and your man looks at him and simply says, "He looks all right to me," he has no card, you ask for no identification, he could have been in Canada from some foreign source, he might be thoroughly undesirable, and once he gets here he is lost in the industrial center or some farm occupation, and here he is, and from that point he can start, unless by sheer accident there should be an apprehension.

Mr. Mackey. I might correct that, Senator. We do ask for identification in all cases. The inspector must be satisfied that he is either a native citizen of Canada or a British citizen lawfully domiciled in Canada.

Senator Dirksen. But to a subversive it would be very easy to obtain the necessary identification because he knows how to handle it.

Mr. Mackey. That is right.

Chairman Bridges. How do you know that the people get in illegally? As Senator Dirksen suggested, sometimes they have to go under social security. How does that come to your attention?

Mr. Mackey. Under the law, the new law, the records of the Federal Security Agency are made available to the Immigration Service in that respect.

Chairman Bridges. But in applying for a social-security card, do they have to furnish a birth certificate? Suppose Joe Doakes applied for a social-security card, and went to work, and says he was born in Lakeland, Fla. You have no way of checking on him unless he tells the truth to Social Security, do you?

### ALIEN'S NATIONALITY NOT SHOWN

Mr. Devaney. Unfortunately, from our standpoint, the Social Security records at the present time do not show the alien's nationality. We have been negotiating with them hoping that they would amend their form in some way to obtain this information so we can give full effect to this provision in the Immigration and Nationality Act. Today their records are not much help to us.

Senator Dirksen. At that point, Mr. Chairman, I might say that they have always maintained such high restriction and secrecy on the social-security records.

Mr. Devaney. That is right.

Senator Dirksen. Are those records made freely available to you?

Mr. Devaney. They have not been so far. We are hopeful they will be. We have been negotiating with them to have those records made available, not only made available but more effective.

Chairman BRIDGES. At this point in the record we will insert a memorandum received from the Acting Commissioner on the implementation of section 290 (c) of the Immigration and Nationality Act.

(The memorandum referred to follows.)

UNITED STATES DEPARTMENT OF JUSTICE,
IMMIGRATION AND NATURALIZATION SERVICE,
*Washington 25, D. C., April 1, 1953.*

Memorandum in re: Implementation of section 290 (c) of the Immigration and Nationality Act (which requires the Federal Security Agency to furnish the Immigration and Naturalization Service information from social-security records).

Representatives of this Service and of the Federal Security Agency have been conferring with a view to working out an arrangement, mutually satisfactory to both agencies, whereby this Service will be able to obtain the information from social-security records which section 290 (c) of the Immigration and Nationality Act requires the Federal Security Agency to furnish.

Two conferences have been held to date between representatives of the two agencies, the first at Baltimore on December 9, 1952; the second on January 16, 1953, at Washington, D. C. These conferences have been supplemented by a number of telephone conversations. The conferees have explored informally the extent to which they can agree and have considered certain alternative means of implementing section 290 (c).

The social-security records referred to in section 290 (c) are maintained by the Federal Security Agency's Bureau of Old-Age and Survivors Insurance. The conferees representing the Federal Security Agency were all from that Bureau, with the exception of one representative of the Federal Security Agency's Office of the General Counsel.

Section 290 (c) contains two distinct provisions: one requires the Federal Security Agency to notify the Attorney General "upon request whenever any alien is issued a social-security account number and social-security card"; the other requires the Federal Security Agency to furnish "such available information as may be requested by the Attorney General regarding the identity and location of aliens in the United States."

With respect to the first portion of section 290 (c), there was a direct conflict of view between the representatives of the Bureau of Old-Age and Survivors Insurance and the representatives of this Service, as to whether it requires that, following a blanket request of the Attorney General, the Federal Security Administrator must thereafter automatically furnish to this Service notification of the issuance of a social-security account number and card to any alien. The representative of the Federal Security Agency's Office of the General Counsel made it clear that the view on this point expressed by the representatives of the Bureau of Old-Age and Survivors Insurance was strictly the view of that Bureau, alone, and that the Federal Security Agency has not yet considered the question.

With respect to both portions of section 290 (c), the representatives of the two agencies also differed as to which agency was required to bear the cost of furnishing the information required to be supplied this Service by the Federal Security Agency under these provisions.

The Federal Security Administrator has not yet had an opportunity to consider the matter. This Service has been advised that the Administrator desires to see a mutually satisfactory arrangement worked out between the two agencies. The Bureau of Old Age and Survivors Insurance is preparing a report to the Federal Security Administrator as to the alternative means considered by the conferees of achieving the objectives of section 290 (c). It is understood that this report will be submitted to the Administrator within the next 10 days.

The areas of agreement and disagreement between the conferees as to the two portions of section 290 (c) are separately discussed below.

PART 1. AUTOMATIC NOTIFICATION WHENEVER AN ALIEN OBTAINS A SOCIAL SECURITY ACCOUNT NUMBER AND CARD

The view of this Service as to the meaning of the first portion of section 290 (c), as expressed by its conferees, is that it requires the Federal Security Agency, on blanket request therefor by the Attorney General, to notify this Service whenever an alien obtains a social security account number and card. The representatives of this Service pointed out that this is the only construction of the provision that can give it practical effect.

The legislative history of the provision makes it clear that the Congress intended that it be given practical effect, and left the details to be worked out administratively in a manner feasible to the Bureau of Old Age and Survivors Insurance and acceptable to this Service.

The genesis of this provision is indicated in report No. 1515, Senate Committee on the Judiciary, 81st Congress, 2d session, 1950. This report was prepared following an exhaustive study of our immigration and naturalization laws and policy by a special subcommittee of the Senate Committee on the Judiciary. At page 330 the report noted that under then existing regulations the social security records were confidential and not open to officers of this Service. Consequently, aliens smuggled into the United States or aliens violating the terms of their admission as nonimmigrants could apply for social security cards, work and obtain social security benefits in complete disregard of the immigration laws, and with impunity, since their action to obtain social security benefits would not bring them to the attention of the arm of the Government (this Service) charged with responsibility to detect their illegal presence in the United States and deport them.

The report further noted that it had been suggested that the social security laws be amended to require foreign-born persons applying for social security cards to give certain essential information by which their status under the immigration laws could be determined and that a copy of such person's application for a social security card be furnished to this Service. The report states the view of the committee that if such legislation were enacted, illegal entry and illegal residence would become more difficult for aliens and less frequently resorted to, and the problems of this Service in enforcing the immigration laws would be reduced and simplified accordingly.

It is further indicated in the report that the committee considered that if the social security records of aliens were made available to Government enforcement agencies, it would be of inestimable value, and that the cooperation of the Federal Security Agency in furnishing this service information concerning the whereabouts of aliens would enable this service to apprehend such aliens in many cases without resorting to long investigation.

This led to the inclusion in the omnibus draft legislation prepared by the committee of a provision generally corresponding to section 290 (c) of the Immigration and Nationality Act. It is obviously impossible to accomplish the objective sought to be achieved by this provision in the law if this service were limited by it to making individual requests for socal security data "whenever any alien is issued a social security account number and social security card." When an alien illegally here applies for a social security account number, only the Federal Security Agency, and not this service, knows that fact. If this service knew about the illegal presence of the alien in the United States through other sources, there would be no need to resort to the social security records under the first portion of section 290 (c). If at this point this service knew of the alien's presence in the United States and of his seeking work, then the second portion of section 290 (c) would come into operation, and under its authority this service would be able to procure information concerning him from the social-security records.

In short, if this service is not automatically furnished notification by the Federal Security Agency "whenever any alien is issued a social-security account number and social-security card," then the first portion of section 290 (c) fails to have any practical effect, and is of no use to this service in achieving the objective set out in the omnibus report of enabling this service to apprehend aliens illegally here and illegally working, through information being furnished as to their receiving social security account numbers and cards. It is inconceivable that the Congress put this provision into section 290 (c) without meaning for it to have practical effect.

The further legislative history of this provision bears out that Congress desired it to have practical effect. The provision found its way into succeeding drafts of the omnibus immigration and nationality legislation. It appeared in H. R. 2379, the bill which was the predecessor of H. R. 5678, the bill that became (along with the corresponding Senate version) the present Immigration and Nationality Act.

The Federal Security Agency voiced its objections to the provision in section 290 of the draft legislation, as it appeared in H. R. 2379 (the predecessor House bill), in a communication which the Committee on the Judiciary of the House of Representatives included in its report on H. R. 5678. In this report (No. 1365, 82d Cong., 2d sess., 1952) at pages 69–73 the House Committee on the

Judiciary stated that, having considered this communication, the Committee desired "to state that it is not its purpose to interfere in any way with the operation of the Social Security Act."

The committee did insert the words "upon request" in section 290 (c) and in its report did state that it believed that most of the objections raised by the Federal Security Agency "with regard to the provisions of section 290 * * * have been alleviated by the rewritten language in the same section as it now appears in the instant bill."

Nevertheless, the committee thereupon also inserted in its report a subsequent letter to the committee from the Federal Security Agency in which that Agency set out its interpretation of the changed version of section 290 (c), and requested that if its interpretation were correct, its interpretation be reflected in any discussion contained in the committee report or other legislative history of section 290.

Significantly, the committee did not go on record, as requested to do so by the Federal Security Agency, and did not state that this interpretation advanced by the Federal Security Agency was correct. Of especial importance to the construction of the meaning of the first portion of section 290 (c) is the fact that the committee merely stated (at p. 74) that:

"The committee trusts that the Attorney General and the Administrator of the Federal Security Agency will work out a satisfactory arrangement, and it strongly recommends the enactment of section 290, as now proposed, for material security reasons."

It thus appears from the committee's own remarks in its report, as distinguished from the objections voiced in the correspondence from the Federal Security Agency, that while the committee did not desire section 290 to interfere with the operation of the Social Security Act, it strongly wanted the provision enacted for material security reasons, and believed that the two agencies would work out a mutually satisfactory arrangement, under which this Service would get the information it needed from social-security records to aid in the enforcement of the immigration laws.

The representatives of the Bureau of Old Age and Survivors' Insurance took the view that because the Congress inserted the words "upon request" in section 290 (c) following receipt of the objections voiced in the first communication to the committee from the Federal Security Agency, the Federal Security Agency interpretation stated in its second communication should govern. Accordingly, it was the position of the representatives of that Bureau that only where specific requests are submitted must the Federal Security Administrator furnish notification to this Service of the issuance to an alien of a social-security account number and card.

This view robs the word "whenever" appearing in the first portion of section 290 (c) of its normal dictionary meaning. Moreover, as already stated, this interpretation would make the first portion of section 290 (c) have no more effect than the second portion in that section. The representatives of the Bureau of Old Age and Survivors' Insurance conceded that their view might make the two portions of section 290 (c) redundant.

The representative of the Office of the General Counsel of the Federal Security Agency who participated in these conferences made it clear that he did not regard the matter as being strictly a legal question and indicated that he hoped a mutually satisfactory arrangement could be worked out between this Service and the Bureau of Old Age and Survivors' Insurance, without having to refer the matter for any legal opinion. The representatives of this Service agreed with him that if a mutually satisfactory administrative solution could be found, such an arrangement would best implement the expressed intent of Congress to open up the social security records to this Service, but without interfering with the operation of the Social Security Act.

The conferees thereupon discussed the question whether, assuming the law requires the Bureau of Old-Age and Survivors Insurance to furnish this Service a notification whenever an alien obtains a social-security account number and card, upon a blanket request therefor by the Attorney General, what would be the most feasible method of furnishing that information.

The representatives of this Service initially proposed that the application for social-security account number and card (Treasury form SS–5) be revised to add a question whether the applicant is a citizen or an alien and, if an alien, what his alien registration number is. It was suggested that a copy of each application card on which the applicant indicates alienage might then be furnished to this Service. From the point of view of this Service, this would be the simplest opera-

tion for us to handle. This proposal conforms closest to the suggestion (referred to above) in Senate Report 1515, 81st Congress, 2d session (at p. 330) that the social-security law be amended to require foreign-born persons applying for social-security cards to give certain essential information by which their status under the immigration laws could be determined and that a copy of such applications be furnished this Service.

However, the representatives of the Federal Security Agency contended, and the conferees representing this Service conceded, that if such inquiries were added to the applications for social-security account number and card it would tend to cause some aliens illegally here to falsify, particularly as to alienage. Such falsifications, and the use by such aliens of social-security cards belonging to other persons, would cause administrative difficulties in the operation of the Social Security Act and tend to defeat the objective sought to be accomplished by section 290 (c).

The representatives of the Bureau of Old-Age and Survivors Insurance seriously objected to this proposed change in the application form from the viewpoint of their Bureau. They indicated that the resultant duplications of accounts would cause too many administrative problems later on. Moreover, if the alien registration number became associated with the social-security account number, aliens would be reporting, or making inquiries, concerning their social-security accounts under their alien registration number. Moreover, they felt that it would squarely bring to public attention the fact that the social-security records were being made available to this Service and injure the public reliance in the confidentiality of these records which the Federal Security Agency has sought to foster. The representatives of the Bureau of Old-Age and Survivors Insurance made it clear that they would much prefer having no change made in the application form and instead have all applications showing birth abroad (this fact already appears on the application form) furnished to this Service for check against its records to determine whether the person is an alien and, if so, whether he is illegally here.

The representatives of this Service pointed out that this would considerably increase the cost to this Service of handling these application cards. Those which did not match any alien record would have to be checked against the naturalization records. Moreover, there would be a small percentage of cases in which investigation would establish that the foreign-born individual is a natural-born citizen of the United States under the provisions of our laws which confer United States citizenship at birth on certain persons born abroad. As for this small number of cases, it may be possible to work out some arrangement with the State Department Passport Office whereby the records of that Office might be checked to determine whether a United States passport was ever issued to any such applicant whose application does not match a record of this Service.

The representatives of this Service at the conferences stated that, in view of the congressional indication that the matter should be worked out administratively in a manner satisfactory to both agencies, this Service, in consideration of the serious objections raised by the Bureau of Old-Age and Survivors Insurance to changing the application form for social-security account number and card, would initially be willing to try out an arrangement under which this Service would get copies of the applications for social-security account number and card hereafter filed in the present form.

One of the considerations affecting this Service's willingness to compromise on this point is that if the two agencies proceeded on the basis that this Service would get the present type application forms whenever the applicant reported foreign birth, this Service could experiment to see what difficulties it would encounter in checking its records and coming up with the residue of those who are aliens illegally here or working illegally. If it were practicable, then the Federal Security Agency would be saved from the anticipated confusion of its records and this Service might possibly be enabled to locate aliens who, if the form were changed, would falsely or erroneously claim to be United States citizens, and whose applications would therefore not be furnished this Service.

However, if accepting the present application form on all foreign-born applicants turned out to be too much of an administrative problem to this Service, then this Service would have a basis of experience for requesting the Federal Security Agency to have the application form changed to reflect citizenship or alienage. Because any listing of alien registration numbers on the applications for social-security account numbers and cards would tend to confuse social-security numbers with alien registration numbers, this Service's conferees are not pressing this point at the present time.

The next problem the conferees considered in this connection was the expense involved in the Federal Security Agency's furnishing copies of social-security applications to this Service under the blanket procedure proposed by this Service.

As set out in the communications of the Federal Security Agency to the House Committee on the Judiciary (appearing in H. Rept. 1365, 82d Cong., 2d sess., 1952), the Federal Security Agency contended that it should be reimbursed by this Service for the costs of furnishing the required information to this Service. The essential reasons advanced by that Agency are that the moneys collected under the Social Security Act are treated as a trust fund, and there is a general requirement in the Social Security Act that the Federal Security Agency be reimbursed for information furnished other agencies from its records. In its second communication to the committee, the Federal Security Agency asserted that it assumed that, in the absence of anything to the contrary in the bill, it could charge this Service the cost of furnishing the required information. Here, again, the committee was silent and left it to the two agencies to work out a satisfactory arrangement.

It is obvious that this is a matter that has to be worked out administratively on some temporary basis until it can be ascertained from the Congress in the budget of which agency it desires the cost of furnishing this information to be included. Neither budget provides for this at the present time. The Congress can equally well provide an item in the budget of the Federal Security Agency to cover these costs, payable out of the general funds of the Treasury rather than out of social-security funds, or add an item to the budget of this Service to cover the estimated costs.

Pending ascertainment of the will of the Congress in this respect, the conferees on the part of this Service suggested that this Service be permitted to station a clerk, working out of its district office, at the headquarters office of the Bureau of Old-Age and Survivors Insurance to work at the point in the processing of the application cards which would interfere least with the processing. It was the view of the representatives of this Service that, if this clerk were provided by this Service with one of the new types of reproducing machines which make single copies rather inexpensively, or perhaps with a microfilm machine, which can do the job very quickly, these cards could be easily copied. The conferees on the part of this Service were not ready to commit this Service on this operation pending submission of the proposal (including estimated cost) to its fiscal people for consideration.

Alternatively, the representatives of this Service indicated that they would possibly consider accepting a copy of the first punch card that the Bureau of Old-Age and Survivors Insurance prepares for its own use from the application cards provided one item could be added to that punch card. This service would desire the first 3 or 4 letters of the country of birth to be code punched on the card. The representatives of the Bureau believed it would be possible for them to punch only the first letter. This might be acceptable to this Service on further exploration of the matter.

The conferees on the part of this Service submitted another alternative proposal in this connection. The field offices of the Bureau of Old-Age and Survivors Insurance immediately send all applications for social-security account numbers and cards to the central office of that Bureau in Baltimore, where they are processed on a centralized basis. This Service's conferees suggested that the field offices of the Bureau of Old-Age and Survivors Insurance might make a copy of the application card (by photo process, if there is any daily volume) before the card is sent to the central office of the Bureau in Baltimore. This copy could be mailed directly either to the district director of this Service having jurisdiction over the district in which the field office of the Bureau of Old-Age and Survivors Insurance is located or to the central office of this Service. The representatives of the Bureau of Old-Age and Survivors Insurance indicated that they favored handling the matter on a centralized basis at the Baltimore headquarters office of that Bureau.

The choice of method was left to be settled after it was determined that the Bureau of Old-Age and Survivors Insurance must furnish automatic notification to this Service on blanket request of the Attorney General.

PART 2.   INDIVIDUAL REQUESTS FOR INFORMATION CONCERNING THE IDENTITY AND LOCATION OF ALIENS

As for the second portion of section 290 (c), the conferees representing both agencies were in agreement as to what it requires. It was agreed that it requires the Federal Security Agency, on receipt of a request from this Service for information concerning a specific individual (including such data as is available con-

cerning him), to furnish this Service whatever information appears in the social-security records concerning his identity or location.

The representatives of this Service at the conferences proposed that, where the Service was looking for an alien believed to be in the United States, it would first endeavor to locate the alien through its own records and investigation. If he could not be thus located, a request on a form agreed to by both agencies would be sent to the Bureau of Old-Age and Survivors Insurance at Baltimore. If this Service had the social-security number available, it would be noted on the form to expedite the search of the social-security records.

The representatives of the Bureau of Old-Age and Survivors Insurance indicated that, except for the address in the original application for social-security account number and card, or for a new card, the social-security system does not obtain a current address for the individual holder of a social-security card. However, by checking against the employer's code number, that Bureau can furnish information as to the current place of work of the individual. There is always a timelag with respect to the posting of such data of approximately 6 to 9 months.

As noted above in relation to the first portion of section 290 (c), the representatives of the Bureau of Old-Age and Survivors Insurance took the position that the Federal Security Agency must be reimbursed by this Service for each search made of the social-security records.

The position of that Agency in this respect is set out in its correspondence with the House Committee on the Judiciary, appearing in House Report 1365, 82d Congress, 2d session, 1952, at pages 69–74.

The conferees on the part of this Service took the same position with respect to this second portion of section 290 (c) as they did as to the first portion; namely, that, since the Congress included no specific requirement for reimbursement in section 290 (c) and made no comment on the point, despite the request by the Federal Security Agency for some affirmative indication that its view was correct, the Congress did not intend this Service to reimburse the Federal Security Agency.

The conferee from the Division of Accounting Operations of the Bureau of Old-Age and Survivors Insurance subsequently advised this Service by telephone that the Bureau's Accounting Division estimates that, depending upon the number of indexes or sets of records that will have to be searched, each individual search under the second portion of section 290 (c) will cost from 35 cents to $1.25 per search and that, by reason of the way the records are arranged, an average search will run about $1 per search. He indicated that, to avoid any need for expensive cost accounting, that Bureau would like to be reimbursed at the rate of $1 per search, to be paid by this Service. This was based upon an estimated 5,000 searches per month.

With respect to this estimated flat rate of $1 per search, this Service has ascertained that this figure includes a pro rata charge for the regular overhead expenses of the Bureau. The conferees on the part of this Service expressed the view that in no event should the overhead costs of the Bureau be charged against these searches, since those overhead costs go on, whether this small side operation is in effect or not.

As noted in relation to the first portion of section 290 (c), the representatives of this Service pointed out that it will be some time before the will of the Congress in this respect is ascertained (as to whether the item to cover the work involved in these searches will be placed in the budget of the Bureau of Old Age and Survivors' Insurance or in the budget of this Service). In the meantime, neither budget contains any item to cover the cost of making these searches, which, if figured on the basis of a dollar per search, would constitute a considerable sum of money.

Accordingly, the representatives of this Service indicated that pending congressional clarification as to which agency should include the item in its budget request, it is essential that some interim arrangement be worked out under which the offices of this Service could submit all necessary individual requests for information from the social-security records concerning the identity and location of aliens. If this were worked out on an interim basis, the experience of the two agencies would make it possible to determine the prospective expenses for the next fiscal year for which it is now possible to submit a budget request to the Congress.

Accordingly, the representatives of this Service suggested that personnel of this Service (probably 3 to 5 clerks) be permitted to be stationed at the Baltimore headquarters office of the Bureau of Old Age and Survivors' Insurance

where the records are maintained and do the searches and other necessary clerical work in connection with the individual checks of the social-security records.    This clerical personnel would operate under the jurisdiction of the district director of this Service at Baltimore, Md.    Initially, the representatives of the Bureau of Old Age and Survivors' Insurance expressed themselves against this method of obtaining the information, inasmuch as such an arrangement would tend to violate the law as to the confidential character of the social-security records.    They suggested that the Bureau have control over those employees, though they be paid by this Service.    It has been intimated in the telephone conversations on this point that a mutually satisfactory arrangement should be easily worked out on this point.

*Footnote*

Further discussions are to be had in the next few weeks between representatives of the two agencies with a view to coming to an agreement, under which an interim arrangement can be put into effect, we hope, as to both portions of section 290 (c).

In view of the immensity of the project, this Service is presently not contemplating trying to go through the records of social security account numbers heretofore issued, with a view to checking all foreign born social security card-holders against the records of this Service.

BENJ. G. HABBERTON,
*Acting Commissioner.*

BORDER AIR PATROL OPERATIONS

SENATOR SMITH. I would be interested with respect to item 4 on your analysis sheet, on how you hit upon the 11 decrease in personnel in the patrol for the detention of illegal entries.    Why 11?

Mr. KELLY. May I answer that?    That came to my attention only the day before yesterday and I cannot imagine anybody being more astounded by it than myself.    I was more astounded by that than anything else in this budget.    It did not come to my attention until the day before yesterday.    If we had a decrease in 100 border patrol positions, I would not have wondered at it.    I would have regarded it as an economy move.    But to wipe out our entire air patrol which is so vital to many of our border patrol operations is simply incomprehensible.    That is all I can say about it.

Mr. MACKEY. These 11 that Senator Smith speaks about are the 11 airplane pilots of the border patrol that are being eliminated.

Mr. KELLY. Yes, sir, and that wipes out our air patrol operation.

Senator SMITH. Who made that decision?

Mr. KELLY. As I say, that did not come to my attention until the day before yesterday, and it appeared in the budget that was sent over here by the Bureau of the Budget.

Senator DIRKSEN. Mr. Andretta, I suppose everybody is looking at you.

Mr. ANDRETTA. All I tell them is how much money they have.    They make their own decision as to where the cuts go.

Senator SMITH. Do you mean to say that the Budget Director made the decision on the number to be cut and the air patrol was wiped out?

Mr. ANDRETTA. No.

Senator SMITH. Who made the decision?

Mr. ANDRETTA. They made it in the Service.

Chairman BRIDGES. What service?

Mr. ANDRETTA. In the Immigration Service.

Mr. KELLY. I just repeat that it never came to my attention until the day before yesterday, and I certainly was never consulted about wiping out our air patrol.

### ADVISABILITY OF DISCONTINUING AIR PATROL

Senator SMITH. Along the lines that Senator Dirksen was speaking, it seems to me that if the patrol is of any use at all, we should go all out for it or cut it all out. I cannot see that you can go halfway in your patrol work and get any results, because while they are going halfway the people can come in on the other side.

### BORDER PATROL APPREHENSIONS

Mr. KELLY. If I may address myself to a remark of Senator Dirksen a minute ago, what we have is a system of locked doors with no connecting walls. Now every few days or every week we are apprehending smuggled European aliens from Canada. During the first 8 months of the current fiscal year, border patrol apprehensions have amounted to more than 492,000. In January and February of this year more than 128,000 have been apprehended. That represents an invasion of the United States in my opinion. It does not do a bit of good to set up all these controls in the ports of entry if we are going to just leave the borders wide open.

### DETERMINATION OF DECISION

Chairman BRIDGES. Who did make the decision on cutting out the air patrol?

Mr. KELLY. I wonder.

Mr. MACKEY. I did not make it, Mr. Chairman. I was not consulted.

Senator SMITH. Mr. Chairman, I would like to know who did make it, and if they do not know, I would like to get the information before we go on the Senate floor. If my memory serves me correctly, I am of the opinion that this border-patrol service has been cut year by year, and I would like for the record something to show just how much it has been cut since 1940.

Mr. MACKEY. We have not reached that yet, Senator Smith. I will reach the border patrol in a very few minutes, and then I should like Mr. Kelly, who is Assistant Commissioner in charge of the border patrol, to speak to that.

Senator SMITH. You will give us that information for the record, if you please.

Mr. MACKEY. Yes.

### ADMINISTRATION OF LAWS IN GUAM

Of course, we recently moved into Guam. The act places Guam within the definition of the United States. We thus have to shoulder the complete responsibility for the administration of the immigration and nationality laws in Guam. Heretofore this has been handled by the island government in Guam. For the past few months we have had a small detail stationed there in preparation for transition in an orderly manner.

Senator DIRKSEN. What is in and out of Guam that would require that many?

Mr. MACKEY. I think the majority are Filipino laborers moving in and out of Guam.

31759—53——16

Mr. DEVANEY. Of course, we have the aliens applying for admission from the trust territory islands around there, and it is quite a job inspecting them. We have considerable transit air work, that is, the planes from Japan, Okinawa, and the Philippines on to the United States and Honolulu which have to be inspected.

Senator DIRKSEN. I was thinking of the volume. What is there in Guam to bring them in unless they are going to work at one of the air bases? You are speaking of the Filipino laborers. Would there be such a volume of Filipino labor in and out of Guam?

Mr. MACKEY. Yes, sir.

Senator DIRKSEN. For what purpose?

Mr. MACKEY. For the purpose of construction work for the Navy.

Senator DIRKSEN. Of course they cannot get beyond Guam. That is to say, they could not get over here?

Mr. MACKEY. No, not under the law, no. But under the law we are required to inspect them.

Senator DIRKSEN. What is the overall number of entries in the projects there over a period of time?

Mr. MACKEY. We haven't it available. We will have it for the record.

(The information referred to follows:)

ESTIMATED WORKLOAD FOR IMMIGRATION AND NATURALIZATION SERVICE ON ISLAND OF GUAM

*Inspection: Figures for the 6-month period, August 1952 through January 1953, of inspection work performed on the island of Guam*

|  | August | September | October | November | December | January | Approximate annual volume |
|---|---|---|---|---|---|---|---|
| Vessels boarded on arrival | 35 | 29 | 31 | 32 | 39 | 35 | 402 |
| Aircraft boarded | 132 | 225 | 159 | 136 | 137 | 124 | 1,826 |
| Alien crewmen examined | 475 | 463 | 412 | 388 | 558 | 544 | 5,680 |
| Citizen crewmen examined | 697 | 1,309 | 725 | 532 | 679 | 562 | 9,008 |
| Other aliens examined | 530 | 484 | 395 | 448 | 384 | 446 | 5,374 |
| Other citizens examined | 879 | 760 | 813 | 675 | 823 | 693 | 9,286 |

ALIEN REGISTRATION

It is estimated that there are 13,000 Filipino aliens on Guam in a temporary status who were imported for labor purposes by the Navy, Air Force, and their contractors; 1,000 such aliens who have left their employment and are in an illegal status, 1,000 natives of trust islands who are on Guam illegally, and 2,000 aliens who may be considered lawful residents. In order to establish the status of such aliens, it will be necessary to effect their registration under the Immigration and Nationality Act. These aliens were not subject to registration under the Alien Registration Act in effect prior to December 24, 1952. It is proposed to effect the registration of aliens on Guam by soliciting the assistance of the Navy, Air Force, and its contractors, insofar as the registration of the temporary Filipino laborers. Others will be registered by the Immigration and Naturalization Service because of the necessity of determining status. Registration of all aliens is necessary to establish records of entry because before the Service assumed jurisdiction on June 16, 1952, few if any entry records were made. Such records of entry are necessary for naturalization purposes and in immigration actions such as reentry permits, visa petitions, etc.

INVESTIGATION AND DEPORTATION

As mentioned above, it is estimated that some 2,000 aliens are on Guam in an illegal status. It will be necessary for the Service to investigate such cases looking to the deportation or adjustment of status of the aliens.

### NATURALIZATION

There are estimated to be some 2,000 aliens on Guam in a legal status. It is not known how many will apply for naturalization, but an estimate of 1,000 appears to be conservative. As stated above, it will be necessary to effect the registration of these aliens to establish lawful entry for naturalization purposes, but once that is done, there will be an influx of naturalization applications.

Senator DIRKSEN. You do not have that figure at the moment?

### CONDITIONS ON GUAM

Mr. MACKEY. No; not available. I might say that insofar as our 12 employees are concerned in Guam, conditions are very bad there, particularly from the standpoint of housing. We find it very difficult to find men who are willing to go to Guam for that reason. The Navy recently cut off our employees, although we will only have 12 there, from commissary privileges. They stated it was for the reason that in permitting other than naval personnel from using the commissary privileges, it affected the economy of Guam.

Senator DIRKSEN. You mean 12 people would affect the economy of Guam?

Mr. MACKEY. Apparently that is the way the Navy feels about it. My position is, I feel that the few employees we do have in Guam are just as much a part of the defense of that island as a navy is. I understand the Navy civilian employees are all given commissary privileges equally with those of their naval and officer personnel.

Senator DIRKSEN. Mr. Chairman, I think that is a point that ought to be run down.

Chairman BRIDGES. Yes.

Mr. MACKEY. We feel that is very important. Our men are living in Guam in Quonset huts. For a married man with wife and children there are absolutely no housing facilities available that exist.

Senator DIRKSEN. If they had supermarkets in Guam or something it would be a different matter. But the idea of the Navy cutting off some people looks a little indefensible.

### PANAMA CANAL ZONE

Senator ELLENDER. This is not peculiar to Guam. The day before yesterday we had hearings on the Panama Canal Zone. There the Canal Company had commissaries and food was sold much cheaper to the Navy and Army people within a stone's throw of each other than they were at the Company's stores. It has caused a lot of friction between the civilian employees there and the Navy and Army people.

Chairman BRIDGES. Are you sure that the Army and Navy stores sold food cheaper?

Senator ELLENDER. Yes, within a stone's throw of each other. Cheaper than the Canal Company that is Government operated. Yes, sir, that is in the record.

Senator SMITH. Mr. Chairman, that is true everywhere in the world, is it not? Are they not doing that very thing?

Senator ELLENDER. It should not be done. But it is a practice that has been going on with the Army and Navy. As I said, the idea of denying 12 people the privilege of buying at these Navy stores is just something that is unconscionable.

Chairman BRIDGES. At this point in the record we will insert a memorandum and supporting related data received from the Department on Commissary and PX privileges at Guam.

(The information referred to follows:)

### MEMORANDUM RE COMMISSARY AND PX PRIVILIGES FOR IMMIGRATION AND NATURALIZATION SERVICE EMPLOYEES AT GUAM

There is attached a copy of memorandum of December 12, 1952, addressed to the Attorney General by the Commissioner of Immigration and Naturalization recommending that the Secretary of the Navy be asked to restore commissary and exchange privileges to immigration employees stationed at Agana, Guam.

Attached is a copy of a letter of January 13, 1953, addressed to the Secretary of the Navy by the Attorney General requesting restoration of logistic support in the form of ship stores and commissary privileges for Department of Justice employees at Guam. Also attached is copy of self-explanatory letter of February 2, 1953, addressed to the Attorney General by the Acting Secretary of the Navy declining the request for restoration of privileges.

DECEMBER 12, 1952.

To: The Attorney General.
From: Commissioner of Immigration and Naturalization.
Subject: Restoration of commissary and Navy exchange privileges to employees stationed at Agana, Guam.

Our district director at Honolulu is urging us to take strong action to bring about the restoration of commissary and Navy exchange privileges to our employees stationed at Agana, Guam. These privileges were withdrawn by order of the Secretary of Navy from Service and all other civil-service employees effective October 1, 1952. I have been informed that the only persons excepted from the order withdrawing these privileges are civilian employees of the Navy, and certain individuals employed by Brown-Pacific-Maxon Co. and the Luzon Stevedoring Co., holders of contracts with the United States Navy.

This Service assumed responsibility for the administration of the immigration laws in the Territory of Guam on June 16, 1952. This action was preceded by a survey of approximately 2 months by 2 officers of this Service. Prior to that survey, conferences were held in this office between representatives of our Service and of the Departments of Defense, Interior, and State. At such a conference, held on March 14, 1952, Mr. W. Kerr Bassett, from the Manpower Office of the Under Secretary of Navy, and Mr. J. C. McBride, General Counsel's office, Department of the Navy, both representing the Defense Department and speaking for that Department, agreed to make available logistic support to Immigration and Naturalization Service personnel that might be assigned to Guam to carry out our responsibilities there. It was well understood by the conferees that the term "logistic support" referred to commissary and exchange privileges. In reaching a decision to open an office at Agana, Guam, the Service was influenced to a great degree by this commitment. After a decision had been made to establish an office at Agana, the Service, in soliciting applications for transfer of employees to the newly established office there, informed all prospective applicants that commissary and Navy exchange privileges would be available to those who accepted assignments to Guam. You can readily understand that we regard the withdrawal of such privileges from our employees who accepted assignment to Guam as a very serious matter.

I have been informed that it is virtually impossible to obtain food in Guam which may be regarded as safe for human consumption and dispensed under sanitary conditions, except for that which is procured from the commissary there. In addition to the problem of securing food that is safe to eat, our employees are also seriously affected by the withdrawal of exchange privileges because they may no longer purchase from the Armed Forces such utility services as laundry and dry cleaning. I understand that such services are nonexistent, or wholly inadequate in Guam, except those operated by the Navy. In a climate such as that on Guam, these services are an important contributory factor to the health and well-being of our employees. The importance of the availability of commissary and exchange privileges to civil-service employees on Guam is apparently recognized by Navy authorities, inasmuch as civil-service employees of the Navy Department and employees of business firms holding contracts with the Navy are exempted from the order withdrawing such privileges. Unless these privi-

leges are restored, it will become increasingly difficult, if not impossible, to induce Service employees of the caliber needed to serve on Guam to accept a transfer to our station there.

In view of the foregoing I earnestly request that the Department address a letter to the Secretary of Navy, or indicate that we may undertake to do so for your signature, urging reconsideration of the order which resulted in withdrawal of commissary and Navy exchange privileges not only from employees of this Service, but also other employees of the Department of Justice (United States attorney and his staff) whose privileges were also rescinded on October 1, 1952. It is believed the letter should contain the specific request that the Secretary of the Navy authorize the commandant of Guam to restore those privileges at the earliest possible time.

———————

JANUARY 12, 1953.

The honorable the SECRETARY OF THE NAVY,
    *Washington, D. C.*

MY DEAR MR. SECRETARY: At the present time this Department has stationed at Agana, Guam, a United States attorney and his secretary, a United States marshal and 1 clerk, 3 employees of the Lands Division, and 5 employees of the Immigration and Naturalization Service.

Recently these employees of the Department were notified that logistic support in the form of ship stores and commissary privileges heretofore provided by the Navy Department has been withdrawn. Losing this support has made living conditions in Guam more difficult for these persons in that they have been unable to otherwise obtain many necessities of life. Such a withdrawal also adds to our recruitment problem for Guam.

I would deeply appreciate it if you would take steps to restore this logistic support to employees of this Department and I know they would, too.

Yours sincerely,

JAMES P. McGRANERY, *Attorney General.*

———————

DEPARTMENT OF THE NAVY,
OFFICE OF THE SECRETARY,
*Washington, February 2, 1953.*

The honorable the ATTORNEY GENERAL OF THE UNITED STATES.
    *Washington 25, D. C.*

MY DEAR MR. ATTORNEY GENERAL: Your letter of January 12, 1953, relative to extension of commissary store and Navy exchange privileges on Guam to employees of the Office of the Attorney General has been received.

I sincerely regret that existing circumstances on Guam do not permit a waiver to the regulations issued by the Department of the Navy and the Commander, United States Naval Forces, Marianas, governing extension of these privileges.

In explaining the Navy's position regarding the extension of privileges, it is considered advisable to briefly outline the situation on Guam immediately following World War II, and up to the present date. At the end of 1945, Guam had no local economy on which United States citizens and United States Government employees could subsist. The Navy, therefore, provided the necessary facilities to support all American personnel. As the local economy strengthened through the years, privileges were withdrawn from non-Government employees. Many objections were raised as these privileges were gradually decreased. In 1949, a joint Armed Services Commissary Store Regulation and Exchange Regulation were prepared by the Department of Defense and approved by the House Armed Services Committee. These regulations specifically limit the categories of persons entitled to purchase privileges and outline the conditions under which certain classes of persons may be entitled to purchases. These regulations provide in part that, under the direction of the overseas commander, privileges may be extended at installations beyond the continenal United States to civilian officers and employees of the United States, only when supplies can be furnished without unduly impairing the service to military patrons, and when the desired supplies cannot be obtained conveniently from civilian agencies.

In the interest of protecting the fast-developing civilian economy of Guam, the Governor of that island has officially requested that Navy resale privileges be restricted to uniformed personnel stationed on Guam. Further, a joint survey of

0-cr-00054-RMP    ECF No. 60-6    filed 05/03/22    PageID.1078   Page

commercial facilities on Guam was conducted by the Navy, the government of Guam, and the Guam Chamber of Commerce early this year. This survey indicated that the local business community was capable of supporting all non-Department of Defense civilian employees and officers of the United States for commissary store items. By regulation, the Commander, Naval Forces, Marianas, has been granted authority and responsibility for determining whether or not desired supplies and services can be conveniently obtained from Guam sources by employees of Government department or agencies other than the Department of Defense. In the absence of strong justification to the contrary, the Department of the Navy can only affirm decisions reached by the Commander, Naval Forces, Marianas.

. I regret that the decision in this matter cannot be more favorable. Should you desire further information please do not hesitate to call on me.

Sincerely yours,

JOHN F. FLOBERG,
*Acting Secretary of the Navy.*

### DETENTION AND DEPORTATION

Mr. MACKEY. May I now go into detention and deportation in our work, Mr. Chairman. I will hit the highlights only. The objective of our work is to rid the country of aliens who are here illegally, either because they came in illegally or have made legal entrance and after that have become subject to deportation.

Looking toward this objective our officers last year served 55,500 warrants of arrest and conducted over 42,200 hearings on warrants of deportation. This was an increase of approximately 50 percent over the prior year, reflecting the first full year impact of the emphasis added by the Internal Security Act of 1950.

### TOTAL ALIENS DEPORTED

Total aliens expelled from the United States increased from 686,713 during 1951 to 723,956 last fiscal year.

Senator DIRKSEN. That includes wetbacks; does it not?

Mr. MACKEY. It does; yes, sir.

Of particular significance in the light of the Internal Security Act was deportation under formal proceedings of 20,181 aliens, an increase of 49 percent over the prior year. It is also significant that deportations to countries other than Canada and Mexico increased 73 percent. The 20,181 deported under formal proceedings included: 1. Thirty-one subversive or anarchistic; 2. 778 criminals; 3. 50 of immoral classes; 4. 56 mental or physical defectives; 5. 40 violators of narcotic laws; 6. 24 likely to become public charges; 7. 539 who had been previously excluded or deported, and made unlawful entry; 8. 4,469 who remained beyond the temporary periods for which admitted; 9. 3,706 who entered without inspection or by false statements; 10. 9,636 who entered without proper documents; 11. 475 who failed to maintain the status under which legally admitted; and 12. 377 deported on other miscellaneous charges.

### TOTAL WETBACKS

Senator ELLENDER. Mr. Mackey, will you tell us of the 686,713 during 1951, what percentage of the increase of 723,956 last fall were wetbacks?

Mr. MACKEY. The great majority of them were wetbacks; yes, sir.

Senator ELLENDER. How about the number; would you know? Is it 95 percent, would you say, that were wetbacks, or 90 percent?

Mr. KELLY. It would be well up in the 90 percent.

Senator ELLENDER. Up in the nineties.

Mr. KELLY. Yes, sir.

Senator ELLENDER. What cooperation are you receiving now from the Mexican Government in your efforts to stop this wetback problem?

Mr. MACKEY. Very little, sir.

Senator ELLENDER. Is there any law that you know of in Mexico whereby a wetback could be punished by the Mexican Government when that wetback is sent back to Mexico?

Mr. MACKEY. We believe so; yes, sir. But the Mexicans apparently take a different view. I might say we explored that very recently, Senator.

Senator ELLENDER. I am familiar with that and that is why I am asking about it.

Mr. MACKEY. Yes, sir; I know you are.

### NONCOOPERATION OF MEXICAN GOVERNMENT

Senator ELLENDER. Do you not think that this contract we now have with Mexico with respect to obtaining labor here should not be entered into unless we can get more cooperation with the Mexican Government in dealing with this wetback problem?

Mr. MACKEY. I agree with you, sir.

Senator McCARRAN. In that regard, Senator, I think you will agree with me that on this side of the border there is a desire for these wetbacks.

Senator ELLENDER. Yes, sir.

Senator McCARRAN. Last year when we had the appropriation bill up the item that might have prevented them coming over to some extent was stricken from the bill.

Senator ELLENDER. Senator, I want to make a confession, and I said so, said it before the Agricultural Committee. It was my view, when I handled this bill 2 years ago that it would have the effect of minimizing this wetback problem. But I am going to say that it has not. On the contrary, the wetback problem has been about the same. As a matter of fact, I think it has been increased some. Unless we get cooperation in the Mexican Government, I think that we ought to do away with the law that is now on the statute books and let it revert to what it was before. In that way we might be able to have the Mexican Government see the light and assist us in fighting this wetback problem. It is very aggravating to them, but they want us to pay all the expenses and they sit back and do little or nothing about it.

Senator McCARRAN. Will you not have more wetbacks that way?

Senator ELLENDER. I doubt it, Senator, for this reason, that it might awaken the Mexican Government to the point where they are going to have to take steps to prevent it and help us to stop it. As it is now, they have little or no border patrol there. Mr. Mackey, am I right in that?

Senator ELLENDER. We don't have the manpower.

Senator ELLENDER. I am talking about the Mexicans.

Mr. MACKEY. No.

Senator ELLENDER. They do not have anybody there to watch them.

Senator McCARRAN. I understand they have someone there to help relieve the Mexicans of the money they earn over here.

Senator DIRKSEN. Do you politely escort them back across the border, Mr. Mackey?

Mr. MACKEY. That is all we can do, sir.   It amounts to an invasion. May I get off the record, Senator?

Chairman BRIDGES. Yes, sir.

(Discussion off the record.)

### WETBACK LABOR NEEDED

Senator MCCARRAN. We might just as well face this thing realistically.   The agricultural people, the farmers along this side of the border, in California, in Arizona, New Mexico, in Texas, in other States, I don't know about Louisiana, want this help.   They want this farm labor.   They just cannot get along without it.   They do not know what they would do if they did not have it.

Senator ELLENDER. Senator, the 4 States you mentioned there obtained last year 82 percent of the 196,000 that were contracted for.

Senator MCCARRAN. In all probability that is true.   Not only are the border States of that turn of mind, but the States farther North— Idaho, Nevada, Utah.   They come to these States and they are wanted there, because it would be impossible to harvest certain agricultural commodities unless we have that help.

Senator ELLENDER. It strikes me that it would resolve itself in this way, that the contracts will be made by the employers in the United States with employees in Mexico, the same as now being done, in the Bahamas and in Puerto Rico.   We have no special law for that, but there is some kind of an understanding whereby the employers from the United States get the consent of the Jamaicans, let's say, the Government there, to contract so many Jamaicans under certain conditions, and there is no red tape about it, and it is done between the employer, as I said, and the employees.   But here, the Mexican Government has gone so far as to make us, in a contract, agree to feed these people while en route, take them back, provide minimum wages, and give them health insurance, and all that.   It is something they do not get at home.

Senator MCCARRAN. The wetback is little interested in that sort of thing.   In other words, a farmer can get a wetback and he does not have to go through that red tape.

Senator ELLENDER. No, sir.

Mr. MACKEY. Yet the northern farmers will complain and say, "The only foreign labor we can get is that which we must legally import, while you permit these farmers along the border to get all the wetback labor they need.   And we regard that as a subsidy to the farmers along the southern border."

### REPATRIATION BY AIRLIFT

Senator DIRKSEN. Do you repatriate some of these people by flying them back to Mexico?

Mr. MACKEY. Not now; no, sir.

Senator DIRKSEN. Did you?

Mr. MACKEY. Yes, sir.   It is a very expensive operation, but it was a very effective operation.

Mr. KELLY. We say it is very expensive, but compared to the magnitude of the problem, I have never seen a more economical or

effective device. I know it has been a very controversial issue. But if I may repeat what happened, we did that on an experimental basis in California. We were apprehending wetbacks the previous 15 days, at the rate of 878 a day, and within a month we had cleaned them out to where we were having a hard time finding a hundred a day. If we could have kept that stepped up, and once we can get all of these Mexicans out of our hair away from the border and start getting back some control, we could maintain the control. I know we can do it with a relatively small number of men.

Senator ELLENDER. Your totals do not bear you out because it has been on the increase.

Mr. KELLY. When we dropped the airlift, it skyrocketed again. As I say, in January and February, 128,000 apprehensions, 128,000 in 2 months, and January and February are ordinarily the low months.

Senator DIRKSEN. Those are border apprehensions?

Mr. KELLY. In the border areas.

Senator DIRKSEN. Where do you take them and how do you take them back?

REPATRIATION BY BUS

Mr. KELLY. Well, I may say in the lower Rio Grande Valley we have substituted a bus lift on our side of the border for the airlift and even that is effective. We are taking the people we are apprehending in the lower valley and we are moving them up by our own busses 150 or 175 miles and putting them across the river at the point of Laredo.

We moved about 15,000 that way last month and it has already shown results.

Senator DIRKSEN. You deposit them far from home, then?

Mr. KELLY. We deposit them far away from the honey pot. And the Mexican Government, they have not cooperated. I want to say that again. But to a tiny extent in that operation, they have, for the past month cooperated. They have taken the people down to mile 87, or something, some miles below Laredo, and they have been putting them on trucks heading for the interior. Moving these people if you can get them soon after they get in here, being mindful that most of them come from the interior of Mexico, they have had to sell their livestock, their farms, and borrow money to get up, if you can deposit them right back home or maybe a hundred or more miles from home, in the interior of Mexico, within a couple of days, I think it is obvious to anybody how discouraging that is. You take away the practice of coming up here. The airlift was showing that result. Except we had so many of them that it would just have to be a terrific airlift for at least a short period of time to show the result.

It is something you can't nibble at. It is like trying to move a mountain with a teaspoon when you need a bulldozer and a steam shovel.

EXTENT OF BORDER PATROL

Mr. Chairman, while we are on this subject, may I skip and go to the border patrol. Last fiscal year the force engaged upon prevention and detection of illegal entry patrolled more than 11 million miles, ex-

amined over 3 million conveyances and questioned more than 8,700,000 persons. These operations resulted in apprehension of 531,719 deportable aliens, about 4 percent over the prior fiscal year and over 5 times the annual volume immediately following World War II.

The 531,719 apprehensions included 1,215 aliens with criminal records. Also included were 1,122 smugglers of aliens, 38 percent over the prior fiscal year and over 5 times the annual volume immediately following World War II.

The Border Patrol each year is faced with appalling numbers of aliens illegally in the United States who must be arrested and taken to points of expulsion from our country. The number of apprehensions each year has increased by tens and hundreds of thousands, but great numbers of apprehensions do not necessarily reflect effective law enforcement. To return illegal aliens repeatedly to small towns immediately across the border, hundreds of miles from their homes and without opportunity for employment except through another illegal entry into the United States, is not effective. About 75 percent of those apprehended in the United States come from deep in the interior of Mexico. Last fiscal year with congressional approval through supplemental appropriations we removed by airlift some 51,000 aliens to interior points in Mexico. They were points near their homes in Mexico. Under the appropriation for the current fiscal year it was necessary to discontinue the removals by air.

The Border Patrol activity is not affected by the Immigration and Nationality Act.

### SOURCE OF RECOMMENDATION FOR CUT

Senator SMITH. Right there, Mr. Chairman, I would like to ask again if the gentleman will give us the benefit of his findings of where the cut was made and who recommended it. I am perhaps a little insistent about it because of our long wooded border between Maine and Canada. It is not for me to say whether air patrol of the border is the right way to patrol or not. But one way to find out is for the service to decide, whether it be air or ground. Yet I can't see the advantage of cutting 11 people in a service that is as great or as important as this service is. I would like again to ask that he give us the records since 1940 of what seems to be a constant decrease in the Border Patrol service.

Mr. MACKEY. We shall be pleased to do so Senator.

(The information referred to follows:)

The elimination of the air-patrol program was specified by representatives of the Bureau of the Budget as a part of the required reduction in the 1954 estimate.

*Officer positions and appropriations for Border Patrol, fiscal years 1941 to 1953*

| Fiscal year | Patrol inspector position | Appropriation | Fiscal year | Patrol inspector positions | Appropriation |
|---|---|---|---|---|---|
| 1941 | 1,531 | $3,883,400 | 1948 | 1,160 | $5,575,000 |
| 1942 | 1,592 | 3,751,700 | 1949 | 1,125 | 6,265,700 |
| 1943 | 1,637 | 4,757,900 | 1950 | 1,110 | 6,612,630 |
| 1944 | 1,360 | 4,055,100 | 1951 | 1,098 | 6,421,600 |
| 1945 | 1,251 | 4,331,000 | 1952 | 1,259 | 7,563,600 |
| 1946 | 1,352 | 4,224,200 | 1953 | 1,079 | 6,799,600 |
| 1947 | 1,319 | 5,615,900 | | | |

Senator McCARRAN. Mr. Mackey, I do not know where you are in your discussion.    I do not want to break into it.

Mr. MACKEY. That is all I have to say about the Border Patrol, Senator.    I am going back to detention expenses.

### CUTS IN IMMIGRATION SERVICE

Senator McCARRAN. I wonder if I can ask a question, because I have to leave in a few minutes.    Looking at the big table that has been furnished to members of the committee on page 3, it appears to me that severe cuts have been assessed against the Immigration Service.

The duties and responsibilities of this Service have materially increased as a result of the passage of Public Law 414.    I wish you would explain, from a policy viewpoint, just what these recommended reductions below the original 1954 estimates mean from the standpoint of proper enforcement of Public Law 414.

I may have broken into the continuity of your thought, Mr. Mackey; but, if it will be convenient for you to discuss it at this time, I will appreciate it.    Otherwise, I want to defer it until the next meeting of the committee, if it should be done.

Mr. MACKEY. We feel that the cuts made in the budget will prevent us from effectively carrying out the mandates of the Immigration Nationality Act which became effective December 24, 1952.

Senator McCARRAN. For example, under the activity "Patrol and detention of illegal entry," those revised estimates call for a reduction of 11 jobs below the current year, 346 below the original 1954 estimate.

Mr. MACKEY. Yes, sir.    Those 11 jobs are the 11 airplane pilots that we use in these small Cessna and Piper Cub planes to fly the border and maintain communication with radio-equipped jeeps and other patrol vehicles.

Senator McCARRAN. The next previous cut in the original 1954 estimate is in the activity entitled "Investigating aliens' status," or a cut in new positions of 255.    However, an increase of 92 is proposed for this activity over 1953.

Mr. MACKEY. Yes, sir.

### PRESENT BUDGET AUTHORIZATION INADEQUATE

Senator McCARRAN. But the reduction below 1954 original estimates of 255 represents a cut of 177 investigators.

Mr. MACKEY. That is right.    It does, sir.    We cannot, with the force authorized by this budget, effectively investigate petitioners for naturalization as we are required to do under the new act.    Nor can we maintain proper supervision of paroled aliens.    I think now we have something like 22,000 aliens under parole supervision.

Senator McCARRAN. Under parole supervision?

Mr. MACKEY. Yes, sir.

### DELAY IN STAFF RECRUITMENT

Senator McCARRAN. In response to a question to the Attorney General, he stated that there would be a 2-month delay in acquiring a staff for the fiscal year 1954.    I am wondering why this should be so, as it appears that the recruitment could start immediately, at least as

far as getting qualified people lined up is concerned. It is my understanding that you are justifying the appropriation request for the fiscal year 1954, which starts July 1, 1953. Why, then, a 2-month delay?

Mr. MACKEY. I will let Mr. Loughran explain that, Senator.

Mr. LOUGHRAN. Senator, you have an investigation by the FBI of all employees coming into the Service, and that takes a period of time. Not only that, but the amount of money which we are directed to submit on a revised budget; in order to get within that amount of money, we have to have a lapse of approximately 2 months. If the Congress would give us the 485 additional positions which are requested, that is.

Senator MCCARRAN. I am not able to grasp that. I don't see where the 2-month lapse comes in. This is March and this bill is being approved now, or considered now, for 1954, which commences July 1, 1953. You have all this time between now and July 1. Why the 2-month lapse? Where does it come in?

Mr. ANDRETTA. Because you don't get any final funds. There hasn't been an appropriation act finally passed in the last 3 or 4 years that I know of until long after the 1st of July, and you are not permitted to move on anything until you know what you are to finally get. These bills—the House reports one thing; the Senate does another thing—they go to conference; and, by the time the bill is finally acted on, that is the only time you know exactly what you are going to get for next year. That has been after the 1st of July, sir.

Senator ELLENDER. We recessed July 7 last year.

Mr. ANDRETTA. I think last year was as soon as any we have had. There have been continuing resolutions in the years before that, way up until the fall.

Senator ELLENDER. Bills might have passed the Senate but they were in conference.

Senator MCCARRAN. Mr. Mackey, I am sorry to break into your statement at this time, but I may have to leave the committee in a few minutes.

Mr. MACKEY. May I move on, please, sir?

Chairman BRIDGES. Certainly.

### EXPENSES SHIFTED FROM CARRIERS TO GOVERNMENT

Mr. MACKEY. Under the Immigration and Nationalization Act the carriers are relieved almost wholly from responsibilities for expenses of detention, hospitalization, and deportation. Records for the past year show that the annual costs of these services heretofore borne by the transportation lines amount to $643,700 for maintenance and detention ,$80,000 for hospitalization and $163,300 for deportation— a total of $887,000. The added cost to the Government in 1954 will depend largely, of course, upon the volume of alien arrivals and Service activity as to expulsions. The revised estimate includes as increase of $489,000 for these costs.

### EXPANSION OF DEPORTATION FIELD

There were 465 grounds for deportation under prior law. The Immigration and Nationality Act establishes some 700 grounds of deportation. Deportation cases, of course, develop from the activi-

ties of investigators. In the light of the modest increase recommended in the investigative force, plus the added current emphasis upon deportation matters, a slight strengthening of the force engaged upon deportation work seems advisable. For the purpose of handling the tremendous additional burden arising in answering general inquiries from the public, Members of Congress, security agencies of the Government, welfare organizations, and others, as well as to prepare and distribute revised manuals, operations instructions and other reference material urgently needed by field officers charged with the task of enforcing the extremely complex provisions of the new act, the estimate includes 3 adjudicators and 8 clerks.

I would like to move to naturalization, if I may, gentlemen.

### REFUSAL BY FOREIGN GOVERNMENTS TO ACCEPT DEPORTEES

Senator DIRKSEN. I would like to ask one question about deportation. How much difficulty, if any, do you experience on the part of foreign government in their refusal to accept deportees?

Mr. MACKEY. We experience quite a bit of difficulty in that respect, Senator, and that is in the field of Mr. Kelly.

Mr. KELLY. We have something in excess of 4,000 unenforcible orders of deportation at the present time because we cannot procure travel documents from the countries.

Chairman BRIDGES. What do you do, Mr. Kelly, when you are confronted with that situation?

Mr. KELLY. Well, we have aliens under parole supervision or under supervision, pursuant to Public Law 414. We are continually pressing and using all the ingenuity we can to find some way of getting rid of them to some country or another. I may say that the provisions of the Internal Security Act, section 23, which has been repeated in Public Law 414, relating to the detention and parole supervision of aliens, has been a help. It has been our experience generally that any alien can leave the United States if he wants to make the effort. He can, by his own efforts, get a travel document. I recall that during the year prior to the passage of the Internal Security Act we had gotten rid of 4 subversive aliens. You will note by the figures of last year that we got rid of 31 under subversive charges and a much larger number of subversives under ordinary documentary charges, by reason of the—I don't like to use the word harrass—compulsion that we were able to put on to them by keeping them in detention. And, making them report to us and keeping them under supervision after the order of deportation has become 6 months old.

### COMPULSORY FEATURES OF ACT INVOKED

Senator ELLENDER. Is there anything under the law you can do so aggravating that they want to leave the country?

Mr. KELLY. As I say, we have done that.

Senator ELLENDER. What is it?

Mr. KELLY. By invoking the provisions.

Senator ELLENDER. Can you not jail them?

Mr. KELLY. We are holding them in detention.

Senator ELLENDER. I thought this new act would give you full power to make conditions so distasteful they would not want to live in the United States. I would sure try it.

Mr. KELLY. We have been faced since the initial passage of the Internal Security Act with a series of litigations, and we have won some good landmark cases, the Carlson case for example. In that interim, we were unable to detain them because most of these aliens were released under court bond. But we do have 15 of the oustanding subversives, alien subversives, who are not tied up in the Smith Act or other proceedings, in detention. We have those in whose cases the order is more than 6 months old under very strict supervision and we are investigating them periodically. We hope that eventually the compulsory features which that act gives us will force many of these aliens out of the United States.

### UNENFORCIBLES

Senator DIRKSEN. Where are these 4,000 unenforcibles?

Mr. KELLY. I may say that many of them are old, old cases. Some of these cases are 30 years old. In some cases the individual is very innocuous, and he is under parole under very limited conditions. Subversives, we have found, have no difficulty taking off for Poland or the U. S. S. R. or Yugoslavia. We have gotten rid of some very important ones in the last couple of years through that device. In other words, Peter Harisiades, a Greek who had never resided in Poland went to Poland. Overmier, another outstanding Communist, by reason of the pressure we could put on him under the act, just recently elected to go to Poland. He had no difficulty, being a very active Communist, in getting a travel letter to go to Poland. But we ourselves could not get the necessary travel document to send him to Poland.

Mr. MACKEY. May I go off the record?

Chairman BRIDGES. Yes, sir.

(Discussion off the record.)

Chairman BRIDGES. All right, Mr. Mackey.

### INVESTIGATIVE ACTIVITY

Mr. MACKEY. May I go on to investigations, gentlemen? I will try to be as brief as possible.

Last fiscal year all prior records of investigative activity by the Service was exceeded. Almost a half million investigations were completed and the year closed with a backlog of some 143,000 cases as compared with approximately 47,000 that were pending when the year began. Increases were registered in almost all categories of investigations.

During the year 6,114 investigative cases looking to deportation because of Communist membership or affiliation were completed. These cases represent a tremendous expenditure of manpower time. Over 11,000 of such Communist cases were pending at the close of the year. This is more than double the figure of 4,500 such cases which were pending as of the close of the prior year. These investigations in subversive cases produced last year 154 warrants of arrest and 106 deportation warrants.

There were transmitted to the field offices last year 110,000 cases in which the address reports submitted under the Internal Security Act could not be identified with any previous record. Prima facie the

aliens involved are here in illegal status and amenable to deportation action. A backlog of 56,655 of these cases remained at the end of the year.

### EFFECTS OF PUBLIC LAW 414

The Immigration and Nationality Act increases extensively the investigative responsibilities of the service. The revised estimates provide additions of 63 investigators and 25 clerks for such broadened responsibilities.

We will only be able to scratch the surface with that, gentlemen. We certainly will not have effective investigation with only 63 additional investigators. Among the more significant provisions of the new law, we are required to make a full field investigation in the case of every petitioner for naturalization. By removing the racial restrictions on eligibility for citizenship, there will be many thousands of Japanese that are now applying for naturalization. Also, the alien is no longer required to have a first paper or make a declaration of intention to become a citizen. Under preexisting law, he had to file his declaration of intention and wait a period of 2 years before he was eligible for naturalization. That is not required now, although we do still issue declarations of intention to those aliens needing them in some States where they are required for fishing licenses and hunting licenses.

### INVESTIGATION OF PETITIONERS FOR NATURALIZATION

The statute makes it mandatory, for the first time, that a personal neighborhood investigation be conducted in the case of each petitioner for naturalization except in cases or classes of cases in which the Attorney General waives such investigation. There can be no question but that the time to ascertain fitness for naturalization, possible subversiveness, et cetera, is certainly before, rather than after, naturalization. The so-called normal volume of naturalization petitions to be filed in 1954 is estimated at 112,000 and, as explained a few minutes ago under the discussion of naturalization, we have facing us an estimated immediate additional volume of 189,000 applications to file petitions. This takes into consideration the new applicants under the changes in the law concerning racial eligibility and requirements for declarations of intention, whenever any alien is issued a social-security account number and social-security card. For the first time our Service will be able to utilize this most valuable source of information.

Right there, gentlemen, I wish to say we have been negotiating with Federal Security for some time on that. We would like them to revise their card form so that the card would make available the information we deem necessary, of course, to establish that the person is an alien.

### ADMISSIBILITY OF FORMER SUBVERSIVES

The Immigration and Nationality Act permits an alien excludable on subversive grounds to enter the United States if he establishes to the satisfaction of the Attorney General that (1) for at least five immediate prior years he has actively opposed the subversive organization with which he was formerly connected and (2) his admission to the United States would be in the public interest. A detailed report

must be made to Congress in the case of each alien so admitted. For security reasons the investigations in these cases must be exhaustive. While the volume will not be large, these cases will take up a great deal of investigative time.

### MISCELLANEOUS OTHER PROVISIONS

Many other provisions of the new act expand the investigative workload. The law adds new requirements for investigation in connection with new types of petition cases, new excludable classes, new deportable classes, new mandatory grounds for denying discretionary relief to an alien and many other new requirements. These are spelled out in detail on pages 150 to 153 of the justifications before you. The most important single category of these is the new excludable grounds and deportable grounds empowering the Service to act in the cases of narcotic traffickers and narcotic addicts. The task of discovering and expelling from the United States aliens who are here illegally relates to internal security in our opinion, in a most literal sense.

### CENTRAL LIAISON

The Immigration and Nationality Act requires the Service to maintain "direct and continuous" liaison with the State Department's new Bureau of Security and Consular Affairs, the Federal Bureau of Investigation, the Central Intelligence Agency and other security offices of the Government.

We do have that liaison at the present time, gentlemen, and it is proving very effective. We have always worked very closely with FBI and other intelligence agencies of the Government. Well, there it is, gentlemen.

Senator DIRKSEN (presiding). Do you have any further questions, Senator Ellender?

Senator ELLENDER. No.

Senator DIRKSEN. Senator Smith?

Senator SMITH. I have no questions.

### MEXICAN-BORDER PATROL

Senator ELLENDER. I was not here to listen to all that Mr. Mackey had to say. I am wondering how much you have been cut with respect to your border patrols on the Mexican border.

Mr. KELLY. We requested an additional 335 positions. That has been revised, in addition to the 11 pilot positions we spoke of.

Senator ELLENDER. How many have you been allowed?

Mr. KELLY. None. In 1943 we had an authorized force of 1,637 border-patrol officers. Today we have authorized 1,071.

Mr. MACKEY. And they must be divided between the Mexican and Canadian borders and also the Florida area.

Senator ELLENDER. I had particular reference to the Mexican border.

Mr. MACKEY. I think, Mr. Kelly, we have around 700 on the Mexican border at this time?

Mr. KELLY. We have a total authorized force of 726. We, of course, never have that number of trained officers on duty. If you will break

it down, you will find we never had available at any given time more than about 60 units.

Senator ELLENDER. How many more of those you are asking for would be assigned to the 726?

Mr. MACKEY. We are not asking for any.

Senator ELLENDER. Are you being cut back on the ones you have now?

Mr. KELLY. Just the 11 positions. The 11 positions that we have discussed here.

Senator SMITH. And that cuts out the entire part of the air patrol?

Mr. MACKEY. Yes. Take 720 men on a 24-hour basis, and when you consider their sick leave and annual leave, it cuts down tremendously the force available for duty at any one time.

Senator SMITH. Where were most of the air patrols stationed?

Mr. KELLY. We have 10 planes on the Mexican border and 2 planes in Florida.

### RENTAL OF PREMISES

Chairman BRIDGES. Thank you very much, Mr. Mackey. We appreciate having you and your associates here today.

For the record I want to insert a table on the rental of premises occupied by service personnel in border States.

(The information referred to follows:)

*Rentals, Immigration and Naturalization Service, including land-inspection offices northern and southern border, United States of America, and border-patrol offices*

| Location | Use | Annual rental | | Paid by— |
| | | Inspections | Border patrol | |
|---|---|---|---|---|
| St. Albans district· Maine: | | | | |
| Dennistown | Inspections | $360 00 | | General Services Administration. |
| Fort Kent | do | 270 00 | | Do. |
| Houlton | Border patrol | | $644.00 | Do. |
| Jackman | do | | 600.00 | Do. |
| Madawaska | Inspections | 335 00 | | Do. |
| Van Buren | Inspections and border patrol. | 315.00 | | Do. |
| Vanceboro | Inspections | 112.50 | | Do. |
| New York. | | | | |
| Clayton | Inspections and border patrol. | 375 00 | | Do. |
| Hogansburg | Inspections | 276.00 | | Do. |
| Massena | Border patrol | | 378.00 | Immigration and Naturalization Service. |
| Ogdensburg | Inspections | 875 00 | | General Services Administration. |
| Rooseveltown | do | 1,500. 00 | | Do. |
| Thousand Island Bridge. | do | 2,400. 00 | | Do. |
| Miami district· Arkansas· Blytheville | Border patrol | | 300. 00 | Do.[1] |
| Florida | | | | |
| Miami | do | | 4,800. 00 | Do. |
| Perry | do | | 300. 00 | Immigration and Naturalization Service. |
| West Palm Beach | Border patrol and immigration office. | | 2,640. 00 | General Services Administration. |
| Louisiana: New Orleans. | Border patrol | | 2,400. 00 | Do. |

See footnotes at end of table.

256    STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954

*Rentals, Immigration and Naturalization Service, including land-inspection offices, northern and southern border, United States of America, and border-patrol offices—*Continued

| Location | Use | Annual rental | | Paid by— |
|---|---|---|---|---|
| | | Inspections | Border patrol | |
| **Buffalo district:** | | | | |
| Buffalo. N. Y. | Bordes patrol | | $2,400.00 | General Services Administration. |
| Buffalo, N. Y. (Peace Bridge). | Inspections | $3,829.00 | | Do. |
| Niagara Falls, N. Y. | Border patrol | | 900.00 | Do. |
| Rainbow Bridge | Inspections | 4,500.00 | | Do. |
| Whirlpool Rapids Bridge. | ____do | 1,500.00 | | Do. |
| **Detroit district:** | | | | |
| Detroit, Mich.: | | | | |
| Detroit and Canada Tunnel. | ____do | 4,000.00 | | Do. |
| Ambassador Bridge. | | 1,023.00 | | Do. |
| Trenton, Mich | Border patrol | | 216.00 | Immigration and Naturalization Service. |
| **Chicago district:** | | | | |
| Minnesota: | | | | |
| Lancaster | Inspections | 240.00 | | General Services Administration.[3] |
| Pigeon River | ____do | 3,375.00 | | Do.[3] |
| Pinecreek | ____do | 300.00 | | Do. |
| Roseau | ____do | 300.00 | | Do. |
| Winton | ____do | 240.00 | | Do.[2] |
| North Dakota: | | | | |
| Antler | ____do | 156.00 | | Do.[2] |
| Bottineau | Border patrol | | 360.00 | Immigration and Naturalization Service. |
| Carbury | Inspections | 180.00 | | General Services Administration.[2] |
| Dunseith | ____do | 456.00 | | Do.[2] |
| Fortuna | ____do | 216.00 | | Do.[2] |
| Hannah | ____do | 265.00 | | Do.[2] |
| Hansboro | ____do | 216.00 | | Do.[2] |
| Maida | ____do | 300.00 | | Do.[2] |
| Sarles | ____do | 240.00 | | Do.[2] |
| Walhalla | ____do | 210.00 | | Do.[2] |
| **Seattle district:** | | | | |
| Washington: | | | | |
| Kettle Falls | Border patrol | | 300.00 | Immigration and Naturalization Service. |
| Northport | Inspections | 900.00 | | General Services Administration. |
| Montana: | | | | |
| Malta | Border patrol | | 172.80 | Immigration and Naturalization Service. |
| Opheim | Inspections | 576.92 | | General Services Administration. |
| Shelby | Border patrol | | 480.00 | Immigration and Naturaliza tion Service. |
| Turner | Inspections | 150.00 | | General Services Administration. |
| Whitetail | ____do | 150.00 | | Do. |
| **San Antonio District:** | | | | |
| Texas: | | | | |
| Eagle Pass | ____do | 2,365.00 | | Do. |
| Do | Border patrol | | [4] 60.00 | Immigration and Naturalization Service. |
| Edinburg | ____do | | 120.00 | Do. |
| El Indio | ____do | | [4] 240.00 | Do. |
| Falfurrias | ____do | | [4] 420.00 | Do. |
| Hebbronville | ____do | | [4] 300.00 | Do. |
| Hidalgo | Inspections | 6,102.00 | | General Services Administration. |
| La Feria | Border patrol | | 600.00 | Immigration and Naturalization Service. |
| Langtry | ____do | | [4] 120.00 | Do. |
| Laredo | ____do | | 1,500.00 | General Services Administration |
| McAllen | Border patrol and detention facility. | | [4] 1,115.00 | Immigration and Naturalization Service. |
| Mercedes | Border patrol | | 720.00 | Do. |
| Quemado | ____do | | [4] 84.00 | Do. |
| Raymondville | ____do | | 660.00 | Do. |

See footnotes at end of table.

STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954    **257**

*Rentals, Immigration and Naturalization Service, including land-inspection offices, northern and southern border, United States of America, and border-patrol offices—* Continued

| Location | Use | Annual rental | | Paid by— |
|---|---|---|---|---|
| | | Inspections | Border patrol | |
| San Antonio District—Con. Texas—Con. | | | | |
| Rio Grande City... | Inspection............ | $510.00 | ........... | General Services Administration. |
| Do............ | Border patrol.......... | .......... | $420.00 | Immigration and Naturalization Service. |
| Roma.............. | Inspections............ | 420.00 | .......... | General Services Administration. |
| Spofford.......... | Border patrol.......... | .......... | 150.00 | Immigration and Naturalization Service. |
| Weslaco............ | ....do............. | .......... | 420.00 | Do. |
| Zapata............ | Inspections........... | 306.00 | .......... | General Services Administration. |
| Do........... | Border patrol.......... | .......... | 4 120.00 | Immigration and Naturalization Service. |
| El Paso district: Arizona: | | | | |
| Casa Grande....... | ....do............. | .......... | 540.00 | Do. |
| Gila Bend........ | ....do............. | .......... | 360.00 | Do. |
| Phoenix........... | Inspections.......... | 5,669.90 | .......... | General Services Administration. |
| New Mexico: | | | | |
| Columbus.......... | ....do............. | 4 30.00 | .......... | Immigration and Naturalization Service. |
| Hatch............. | Border patrol......... | .......... | 144.00 | Do. |
| Texas: | | | | |
| El Paso........... | Inspections, etc........ | 19,800.00 | .......... | General Services Administration. |
| ....Do........... | Border patrol.......... | .......... | 4 282.00 | Immigration and Naturalization Service. |
| Alpine............. | ....do............. | .......... | 240.00 | Do. |
| Fabens............. | ....do............. | .......... | 300.00 | Do. |
| Fort Hancock....... | ....do............. | .......... | 300.00 | Do. |
| Presidio........... | Inspections........... | 378.00 | .......... | General Services Administration. |
| Ysleta ........... | Border patrol......... | .......... | 240.00 | Immigration and Naturalization Service. |
| Los Angeles district: California: | | | | |
| Andrade........... | Inspections........... | 120.00 | .......... | General Services Administration. |
| Calexico.......... | Border patrol......... | .......... | 360.00 | Immigration and Naturalization Service. |
| Chula Vista....... | ....do............. | .......... | 1,200.00 | Do. |
| San Luis Obispo... | Inspections........... | 1,260.00 | .......... | General Services Administration. |
| Temecula.......... | Border patrol......... | .......... | 4 50.00 | Immigration and Naturalization Service. |
| All locations........... | ..................... | } 30.00 }67,072.32 | 11,771.80 16,184.00 | Do. General Services Administration. |
| Total ........... | ..................... | 67,102.32 | 27,955.80 | |

¹ Immigration and Naturalization Service reimburses General Services Administration until amount can be included in their appropriation.
² Immigration and Naturalization Service now reimburses General Services Administration. General Services Administration will absorb amount in their 1954 appropriation.
³ Immigration and Naturalization Service reimburses General Services Administration in amount of $2,955 p. a. until funds can be provided in General Services Administration appropriation.
⁴ Rental for land only, on which buildings have been erected by Government.

Chairman BRIDGES. I have received the following statement from Miles D. Kennedy, director, national legislative commission, the American Legion, which relates to the Immigration and Naturalization Service. The statement will be made a part of the record at this point.

258    STATE, JUSTICE, AND COMMERCE APPROPRIATIONS, 1954

(The statement referred to follows:)

STATEMENT OF C. H. OLSON, ASSISTANT DIRECTOR OF THE NATIONAL LEGISLATIVE COMMISSION, THE AMERICAN LEGION

Mr. Chairman and gentlemen of the committee, the American Legion appreciates and welcomes this opportunity to come before your committee in support of appropriations for the Department of Justice as they apply to the Immigration and Naturalization Service.

We do not pose as experts in the many ramifications surrounding the implementation and enforcement of the Internal Security Act of 1950, or the Immigration and Nationality Act. However, during recent years we had close association with Mr. Watson B. Miller, former Commissioner of the Immigration and Naturalization Service, while he was in the employ of the American Legion as special consultant to the national commander. From him we learned to know something about the responsibilities and functions of that Service.

The records will show that our organization has long had a deep interest in Americanism. The American Legion, like all other organizations who look to the good of this Nation and its people, deplores infiltration into this country by exponents of subversive activities, or by those whose previous associations render them susceptible to the influences and lures of those, already here, who attempt to spread doctrines inimical to our welfare.

During the time the McCarran-Walter measure was under study in the Congress, the national executive committee of the Legion adopted a resolution placing the support of our organization behind the bill. That support was freely given and may have been most helpful in the final passage of the act. The resolution referred to is No. 18. It was adopted at the regular meeting of the national executive committee in November 1951. Proponents of the resolution presented their case on the basis that the proposed law would provide:

"(1) A system of selective immigration within the national-origins-quota system is established, geared to the needs of the United States.

"(2) More thorough screening especially of security risks is provided.

"(3) Structural changes are made in the enforcement agencies for greater efficiency.

"(4) The exclusion and deportation procedures are strengthened.

"(5) Naturalization and denaturalization procedures are strengthened to weed out subversives and other undesirables from citizenship."

When Public Law 414 was enacted, the membership of the American Legion was fully aware of the need for additional funds and manpower on the part of the Immigration and Naturalization Service if the job of implementation and enforcement were to be adequately done. Please bear in mind that Public Law 414 was one of the last acts of the 82d Congress, and it was the opinion of the Legion that any additional funds required by the Immigration Service for implementation and enforcement of the act had not been provided in 1953 appropriations (Public Law 495, funds for State, Justice, Commerce).

With the above in mind, the American Legion adopted resolution No. 607 at its 1952 national convention. Said resolution reads as follows:

"Whereas, the Internal Security Act of 1950 and Public Law 414 known as the McCarran-Walter bill has caused added enforcement responsibilities in the Immigration and Naturalization Service; and

"Whereas, sufficient funds have not been allocated to the Service to cover the additional personnel necessary to handle this added workload: Now therefore be it

"*Resolved by the American Legion at national convention assembled at New York City, August 24–28, 1952,* That sufficient additional funds be assigned and allocated by the Congress of the United States to the Immigration and Naturalization Service as to permit full enforcement of the provisions of these laws that designate the Immigration and Naturalization Service as the enforcement agency."

You will note that the membership of the Legion did not attempt to distinguish between the responsibilities of the Immigration Service so far as the two laws are concerned. They asked for sufficient additional funds for both purposes.

Public Law 414 and the Internal Security Act of 1950 became laws by a vote of more than two-thirds of the membership of both Houses present and voting. We feel that the vote was an expression of the will of the people. We assume at this time that the will of the same people demands adequate enforcement of both laws. That cannot be done without help.

If all who attempt to sneak into this country around the law, should suddenly decide to fully comply with the law, the problems of the Immigration and Naturalization Service would be much easier. Perhaps they could cope with all requirements without further help. But there is no use in kidding ourselves about such an idealistic situation.

Today, on 15,000 miles of border and coastline, we have about 1,000 men whose job it is to prevent infiltration of all people, good or bad, into this country in evasion of our laws. At this point we ask particular attention be given to the 2,200 miles of land and water border between San Ysidro, Calif., and Brownsville, Tex. Much of our concern is with this thinly protected frontier where the Immigration Service not only has to deal with many of our southern neighbors who wish to come to our country as lawful immigrants, workers, or visitors, but with hundreds of thousands of their countrymen who, one way or another, seek to gain admission to the United States for whatever their purpose be. Perhaps even more important than that is the probability that this particular border frontier offers rather easy avenues of infiltration for the subversives or agents of countries other than those predominantly of the Latin race.

We appreciate that all the problems of the Immigration Service are not on the Mexican border. There is also room for concern about the possibility of flagrant violation of the law by persons on Puerto Rico and adjacent islands. Here, it seems, a comparatively simple falsification of birth records opens wide the door to United States residence on a citizenship-by-birth basis. Communism is not selective; it has followers among all races.

It is reliably reported that in 1949 nearly a half million people who had gained illegal admission to this country were apprehended. That is a known quantity. A guess at the number of those who escaped apprehension would require crystal-ball gazing of considerable magnitude. Estimates of those who illegally enjoy the freedom of this country vary. Some believe the number to be in the millions.

In further consideration of the task of our border guards, we must recognize that 24-hour-per-day vigilance is required. No person can be expected to work 24 hours each day. On top of that there is the hazard of the work which frequently requires these men to work in pairs at least. Reducing those figures to facts we find that we have little more than a sieve of protection through which illegal entries have and are being made.

The mileposts of protection are far apart indeed; the borders are practically open.

It is not our intent or desire to become involved in the money or personnel equations of the Immigration and Naturalization Service. That is a matter for the Department of Justice to propose and defend before the Congress. At this point I wish to state that we do not have a single iota of information from the Immigration Service with reference to their 1954 budget considerations. We do know, however, that there is a minimum basepoint for efficient operation and enforcement of the laws under consideration, below which the job cannot be done in a manner deserving of credit or the confidence of the people of this country.

As representatives of the American Legion, an organization recognized as a strong force in the fight to preserve the ideologies of our Government, we sincerely urge your committee to take firm steps toward providing sufficient funds to implement and guarantee the enforcement of Public Law 414 and the Internal Security Act of 1950.

Chairman BRIDGES. Will you come up please, Mr. Bennett.

BUREAU OF PRISONS

## STATEMENTS OF J. V. BENNETT, DIRECTOR, AND P. G. SMITH, BUDGET OFFICER, FEDERAL PRISON SYSTEM, DEPARTMENT OF JUSTICE

### AMOUNT REQUESTED

Chairman BRIDGES. Mr. Bennett, we are happy to have you with us this morning. The appropriation that we are now considering is for the Bureau of Prisons. The original Truman official budget was $26,390,000. The revised estimate is $25,785,000, a decrease of $605,000. This compares with the 1953 adjusted figure of $25,525,000.